# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## *RADFORD *et al.* v. CARWILE *et al.*

### Decided April 19, 1879.

1. A married woman as to property settled to her separate use is to be regarded as a *feme sole*, and has a right to dispose of all her separate personal estate, and the rents and profits of her real estate accruing during the coverture, as if she were a *feme sole;* unless her power of alienation is restrained by the instrument creating the estate.

2. Such restraint upon her power of alienation will not be implied from her being authorized to dispose of the property in a specified manner. Such restraint must be either expressed, or so clearly indicated, as to be equivalent to an express restraint.

3. The *jus disponendi* is an incident to the ownership of a separate estate; and it can only be taken away, or limited by express words, or by an intent so clear as to be the equivalent of express words.

4. The liability of the separate estate of a married woman to the payment of all her debts, incurred during coverture, is also an incident of the ownership of such separate estate; and it too can only be taken away by express words, or by an intent so clear as to be the equivalent of express words.

5. But these incidents, liability to the payment of her debts, and her *jus disponendi*, extend no further than to all her separate personal property, and the rents and profits of her separate real estate accruing during the continuance of the coverture.

6. The *corpus* of her separate real estate is in no manner affected by the equitable doctrine of a separate estate, which was devised to prevent the acquisition by the husband of his marital rights to all her personal property and the rents and profits of her real property during the coverture.

---

* In view of the importance of the points decided in this and the two following cases, they are by direction of the Court published in advance of their regular order.

7. The common law effectually protected the *corpus* of her real estate against her husband's control, and against his debts. And her common law disability to make any contract, or incur any debt, during her coverture, which will in any manner affect, or charge, the *corpus* of her real estate, whether such real estate be separate property, or not, is still in full force. The *corpus* of her real estate can only be affected, or charged, by the vendor's lien, when it has been reserved, or by a conveyance, or specific lien created by deed, in which her husband has united with her, and which she executed after privy examination.

1878
June Term.

Radford *et al.*
v.
Carwile *et al.*

8. The debts of a married woman, for which her separate estate is liable, are such as arise out of any transaction, out of which a debt would have arisen, if she were a *feme sole*, except that her separate estate is not bound by a bond, or covenant based on no consideration, such bond, or covenant, being void at law, and she not being estopped from showing in a court of equity, that it was based on no consideration.

9. The consideration, which will support an action for her debts, or contracts, so as to make her separate estate liable, need not inure to her own benefit, or that of her separate estate, but it may inure to the benefit of her husband, or any third party, or may be a mere prejudice to the other contracting party; in short it may be any consideration, which would support the contract, if she were a *feme sole*.

10. But her separate estate cannot be made liable for the payment of any debt of her husband, or of any other person, unless she has agreed to pay the same by some contract in writing, signed by her, or by some one authorized by her.

11. The above rules all apply to the separate estate of a married woman held under the third section of ch. 66 of the Code of West Virginia, except: 1st. She holds the legal instead of the mere equitable estate. 2d. She can devise such real estate. 3d. If living separate and apart from her husband, she may sell or convey her real estate without her husband joining in the contract or conveyance; and it is liable for all her debts contracted while so living apart from her husband. 4th. Whether if living with her husband, she may sell her real estate, if her husband joins with her in the written contract or conveyance, without her being privily examined, is questionable; and we express no opinion on this point, it not arising in this case. 5th. Whether this section has had effect on the question, whether a husband has any right to curtesy, or as distributee or administrator of his wife in reference to her separate estate, is also doubtful; and we express no opinion on this point.

12. A separate estate under the third section of ch. 66 of our Code is created simply by conveying land to a married woman, though it be not expressed to be for her sole and separate use.

Appeal from and *supersedeas* to a decree of the circuit court of Fayette county, rendered on the 1st day of September, 1877, in a cause in said court then pending, in which William Radford and Henry Light were plaintiffs, and Martha A. Carwile and James T. Carwile were defendants, granted on the petition of said plaintiffs.

Hon. Homer A. Holt, judge of the eighth judicial circuit, rendered the decree complained of.

GREEN, PRESIDENT, furnishes the following statement of the case :

In July, 1876, William Radford filed his bill in the circuit court of Fayette county, to subject the separate real estate of Martha A. Carwile, a married woman, to the payment of a $100.00 bond, dated May 27, 1874, and payable April 1, 1875, and executed to him by J. T. Carwile and Martha A. Carwile his wife. This bond was in the ordinary form; and on its face it did not charge its payment on her separate estate, or even show, that she had a separate estate, or was a married woman.

The only separate estate owned by her was twenty acres of land in Fayette county, which the day before this bond was executed had been conveyed to her by Johnson and wife. This deed was in the usual form, does not on its face state, that it was for her separate use, or even show that she was a married woman.

This bond and deed are filed with the plaintiff's bill ; and he alleges, that the consideration of the bond was a part of the consideration of this land, which he had sold to Mrs. Carwile ; that he had bought this land of Johnson and wife ; but as they had not executed the deed to him, he directed them to make the deed directly to Mrs. Carwile, to save expense.

The plaintiff in his bill alleges, that this land was sold

1878
June Term.

Radford *et al.*
v.
Carwile *et al.*

and bond taken on the faith, that this land, which was the separate estate of Mrs. Carwile by virtue of this deed, would be liable for the payment of this bond; and she agreed to pay the same out of her separate estate. The bill prays, that this land may be sold to pay this debt.

The plaintiff, Radford, afterwards obtained leave of the court to amend his bill and make Henry Light a co-plaintiff. The amended bill states the additional fact, that this bond before the institution of the suit had been assigned to Light by Radford. The amended bill also alleges, that he, Light, took the assignment of this bond with the knowledge of all the facts stated in the bill, and that Mrs. Carwile was living with her husband. It asks, that the suit may be prosecuted for the benefit of Light, and that this land may be sold to pay this debt.

Mrs. Martha A. Carwile demurred to this bill and amended bill; and also filed her answer. She therein denies the allegations of the bill generally, and especially that this bond was to be a charge on her separate estate, or that there was any agreement of any nature whatever to that effect, either before or after she signed the bond. And she says, that when the suit was instituted, Radford, the plaintiff, had no interest in this bond.

The only evidence taken was the deposition of Radford, who proves substantially the facts as stated in the bill and amended bill, except he fails to prove any promise or agreement by Martha A. Carwile to pay this bond out of her separate estate, or to make it a charge thereon. He states, that he sold this land to Carwile, but directed his vendees, Johnson and wife, to make this deed to Martha A. Carwile, his wife. When he took this bond from Carwile and wife, he expected them to pay it, but he could not say, whether or not he took this bond on the faith that this land would be liable for its payment. On September 1, 1877, the circuit court, being of the opinion that this debt was not a charge on the separate estate of Mrs. Carwile, dismissed the bill at

the plaintiff's costs; and from this decree they have appealed to this court.

*A. Burlew*, for appellants, relied on the following authorities:

Code W. Va. ch. 125, § 12; *Id.* ch. 66 §§3, 12; 1 Hun. (N. Y.) 125; 18 N. Y. 284; 22 N. Y. 460; 68 N. Y. 329; 4 Hun. (N. Y.) 193; 5 Hun. (N. Y.) 497; 6 Hun. (N. Y.) 528; 11 Hun. (N. Y.) 52; 64 N. Y. 217; 70 N. Y. 298; 51 N. Y. 136; 53 N. Y. 423; 55 N. Y. 250 251; 70 N. Y. 296, 297, 298; 22 N. Y. 460; 37 N. Y. 38, 39; 7 Paige (N. Y.) 9; 42 N. Y. 633, 634; 33 N. Y. 371; 15 Ves. 596; 17 Ves. 365; 25 Gratt. 481; 2 Min. Inst. 652; 2 Story Eq. § 1400; 4 H. & M. 113; 7 Gratt. 498; 16 Wend. 360; 38 N. Y. 263; 42 N. Y. 316; 2 Denio 306.

*E. Willis Wilson*, for appellees, relied on the following authorities:

1 Min. Inst. 322, 323, 324; 2 Min. Inst. 577, 578, 579; *Id.* 316, 330, 331; 18 N. Y. 271, 272; 22 N. Y. 450; 68 N. Y. 329; 10 W. Va. 175; 18 N. Y. 453; 4 Gratt. 422.

GREEN, PRESIDENT, delivered the opinion of the court:

The questions presented by the record in this case are: Whether the separate estate of a married woman is liable for her debts? and if so, what is the extent of its liability and its mode of enforcement?

The decision of these questions depends, as we shall find, on what was the law prior to the passage of ch. 66 of our Code relating to the separate property and rights of married women. See Code of W. Va. ch. 66 p. 447. We will therefore consider first what was the law on these points prior to the passage of our Code.

The authorities very generally agree, that the charac-

ter of the separate estate of a married woman might be molded by the instrument, by which it was created. That instrument might lawfully give to her during her coverture the unlimited right of alienation of her separate estate, or render it liable to the payment of all her debts, or it might during her coverture limit her power of alienation, or preclude it altogether and declare it not liable to the payment of any of her debts. See *Pybus* v. *Smith*, 3 Bro. C. C. 347; *Parkes* v. *White*, 11 Ves. 24; *Baggett* v. *Meux*, 1 Coll. 138; 1 Ph. 627; *Tullet* v. *Armstrong*, 1 Beav. 1; *Robinson* v. *Wheelright*, 27 Beav. 214; 6 De G. M. & G. 535; *Peillon* v. *Brooking*, 25 Beav. 214; *Weeks* v. *Sego* 9 Ga. 201; *Nixon* v. *Rose*, 12 Gratt. 428; *Perkins* v. *Hays* 3 Gray 408; *Clarke* v. *Makenna*, Ch. Eq. (S. C.) 163. This therefore we may regard as the settled and acknowledged law.

The questions of controversy have been : whether, when the instrument creating her separate estate simply created this estate, or specified one mode of disposition, which she could make of it, this gave her an unlimited right to dispose of it at her pleasure, and rendered it liable to all her debts, or any of her debts; or whether in the first case the estate was unalienable during coverture, and not liable to any of her debts.

Three widely different views have been taken of the law on this subject.

The first of these views is held by the English courts; and their view has been followed by the courts of a number of the States of this Union. As there has been considerable conflict among the English authorities, and no small controversy in this country as to what have been the results, which they have reached, I propose to examine the English authorities at some length. They form generally the basis of the American decisions; and it is therefore important, that we should have a clear conception of the law, as held by them.

An examination of the old English authorities must, I think, lead any one to the conclusion, that they held,

1878
June Term.

Radford *et al.*
v.
Carwile *et al.*

that when not restricted in her power of disposition, a *feme covert* had the right to dispose of her separate estate in any manner, that she pleased, this right being regarded as an incident to her ownership in equity of the property; and that her separate estate was for a like reason liable to the payment of all her debts. The old English cases, which sustain these positions, are numerous; nor is there any conflict among them. I would especially refer to the following old English cases, as sustaining the unlimited power in such case of a married woman to alienate her separate property at her pleasure : *Parteriche* v. *Powlet,* 2 Atk. 383 ; *Allen* v. *Papworth,* 1 Ves. Sr. 163; *Hearle* v *Greenbank,* 1 Ves. Sr. 298 ; *Grigby* v. *Cox,* 1 Ves. Sr. 517 ; *Peacock* v. *Monk,* 2 Ves. Sr. 190; *Pawlet* v. *Deleval,* 2 Ves. Sr. 663 ; *Neiman* v. *Cartony,* cited in note in 3 Bro. C. C. 346 ; *Clarke* v. *Pistor,* 3 Bro. C. C. 346 ; *Hulme* v. *Tenant,* 1 Bro. C. C. 16 ; *Fettiplace* v. *Gorges,* 3 Bro. C. C. 8 ; *Pybus* v. *Smith,* 3 Bro. C. C. 340; *Ellis* v. *Atkinson,* 3 Bro. C. C. 565.

All these cases were decided prior to the year 1792; and it does seem to me, that they ought to have been regarded as settling beyond further controversy this question. In many of them this power of disposing of her separate estate is assumed, and no reason given therefor; in some of them however the reason is given, or intimated; and they all no doubt proceeded on the same reason.

Perhaps the basis of these decisions is as well stated in *Grigby* v. *Cox,* 1 Ves. Sr. 517, as anywhere else. Lord Hardwick there says : "*For the rule of this court is, where anything is settled to the wife's separate use, she is considered as a feme sole; may appoint in what manner she pleases, and unless the joining of her trustees is made necessary, there is no occasion for that.*" Lord Thurlow in *Hulme* v. *Tenant,* 1 Bro. C. C. 16, says: "The rule laid down in *Peacock* v. *Monk,* 2 Ves. Sr. 190, *that a feme covert acting with respect to her separate property is competent to act in all respects as a feme sole,* is the proper rule, and neces-

sary to support the decisions on this subject." And again he says, after examining the authorities: "I take it therefore, it is impossible to say, but *that a feme covert is competent to act as a feme sole, with respect to her separate property, when settled to her separate use.*" But this language, though very broad, ought to be construed as intended probably by the judges, who used it, as applicable only to a disposition of personal property, or rents and profits of lands by deed or will.

The old as well as modern English cases fully recognize the right of a married woman to dispose of her separate personal estate by will, as well as by deed or act *inter vivos*, when not prohibited from so doing by the instrument creating the estate. See *Fettiplace* v. *Gorges,* 3 Bro. C. C. 8; *Hearle* v. *Greenbank,* 1 Ves. 301; *Rich* v. *Cockell*; 9 Ves. 369; *Gore* v. *Knight,* 2 Vern. 535; *Herbert* v. *Herbert,* Pr. Ch. 44; *Wagstaff* v. *Smith,* 9 Ves. 520; *Thockwell* v. *Gardiner,* 5 De G. & Sm. 58; *Hodgson* v. *Hodgson,* 2 Kee. 704; *Humphreys* v. *Richards,* 2 Jur. N. S. 432. But the weight of the old English authorities was against the right of a married woman, where not expressly authorized so to do, to dispose of her separate real estate by will, or by her sole deed; though the modern English authorities hold that she may, if not prohibited. See *Anon.* cited *Peacock* v. *Monk,* 2 Ves. Sr. 190; *Churchhill* v. *Dibben,* 2 Keny. Pt. II. 98; *Harris* v. *Mott,* 2 Bea. 169; *Lechemere* v. *Brotheridge,* 32 Beav. 353; *Hodsden* v. *Lloyd,* 2 Bro. C. C. 534; *George* v. *Jew,* Amb. 627; *sed vide Wright* v. *Englefield,* Amb. 468; or *Wright* v. *Cadogan,* 6 Bro. P. C. 156; *Rippon* v. *Dawding,* Amb. 565; and the modern English cases: *Taylor* v. *Meade,* 34 L. J. (N. S.) Ch. 203; *Hall* v. *Waterhouse,* 5 Gif. 64; 13 W. R. (V. C. S.) 66; 11 Jur. (N. S.) 361; and *Pride* v. *Bubb,* 7 L. R. ch. App. 64, cited in White & Tudor's Leading Cases in Equity, 4th American from 4th English edition top pages 656, 658, and side pages 490, 491, 492; in which it is held, that when unrestrained, she may dispose of her real estate by will.

One of the reasons for distinguishing between her right to dispose of her separate property by deed and will probably was, that it was not considered essential to her full and perfect enjoyment of her separate property, that she should be allowed to dispose of it by will; though it was essential, that she should be permitted to dispose of it by deed, or act *inter vivos*, in order to give her the full enjoyment of it as property. But this could not have been the only reason, as she was permitted always to dispose of her separate personal property by will. The old English cases were, I think, equally explicit in holding, that where it was not otherwise provided in the instrument creating the estate, her separate estate, real and personal, was liable to the payment of her debts. They held it was liable to the payment of her bond. In *Lillia* v. *Airey*, 1 Ves. Jr. 277; *Norton* v. *Turville*, 2 P. Wms. 144; *Peacock* v. *Monk*, 2 Ves. Sr. 193, though it was given to her husband, or though she had joined in it with him as his surety, as in *Hulme* v. *Tenant*, 1 Bro. C. C. 16, or with a stranger as in *Heatley* v. *Thomas*, 15 Ves. 596; *Stanford* v. *Marshall*, 2 Atk. 68; and it was equally held bound for her bill of exchange, promissory note or agreement in writing of any character. See *Stuart* v. *Kirkwall*, 3 Madd. 387; *Owen* v. *Homan*, 4 H. L. Rep. Cas. 998; *Bullpin* v. *Clarke*, 17 Ves. 365; *Field* v. *Lowle*, 4 Russ. 112; *Master* v. *Fuller*, 4 Bro. C. C. 19; 1 Ves. Jr. 513.

It is true, these were cases, in which the debt was acknowledged in writing; but the separate estate was held liable to her debts and engagements evidently from the old English cases, not because they were evidenced by writing, but simply because they were her debts and engagements, her separate property being held liable for her debts, because its liability to the payment of debts was incident to her ownership of the property. It is true, in most of the cases no allusion is made to the grounds, on which it was held liable; but as there was nothing in the settlement specially making it liable, the courts assumed and held it liable as a matter of course,

because it was her separate property. That they did not so hold under the idea, that in executing the bond or other writing she had executed a power to dispose of her property, is obvious from no allusion being made to such an idea. This idea is obviously of modern origin. The court in the old cases had no conception thereof, and make no allusion to such power as the origin, on which her separate estate was held liable for her debts. No one can read these old cases, and come to any other conclusion, than that the courts, had they been called upon, would have held her separate estate liable to all her debts and engagements, though they were merely verbal, or were simply implied obligations.

In a few of these old cases there is an allusion to the grounds, on which the separate estate of a married woman is held liable for the payment of her debts in a court of equity; and they show, that it was based on the broad and intelligible ground, I have mentioned: that it was an incident to the ownership by her of the property, just as her right to dispose of it was an incident to such ownership.

Thus in *Norton* v. *Turville*, 1 P. Wms. 144; the Master of the Rolls says: "The bond given by the *feme covert* is merely void; and in that respect differs from a bond given by an infant, which is only voidable," &c. "But in this case all the separate estate of the *feme covert* was a trust estate for the payment of debts." And it was accordingly held liable for the payment of her bond. The trust did not say anything about the estate being held for the payment of her debts. This was an inference drawn simply from the creating the separate estate. It was obviously regarded as an incident to the ownership of the property by her; and the inference would apply as well to a debt not evidenced by writing, as to her bond. The inference drawn by the Master of the Rolls is, that her separate estate was liable for all her debts.

1878
June Term.

Radford *et al.*
v.
Carwile *et al.*

Lord Thurlow is very explicit in declaring the grounds, on which the separate estate was held liable to the payment of her debts. In *Hulme* v. *Tenant*, 1 Bro. C. C. 16, he says: "But in respect to a *feme covert* determined cases seem to go thus far, that the general engagement of the wife shall operate on her personal property, shall apply to the rents and profits of her real estate, and that her trustees shall be obliged to apply personal estates and rents and profits, when they arise, to the satisfaction of such general engagements." And again: "If a court of equity says a *feme covert* may have a separate, estate, the court will bind her to the whole extent as to making that estate liable to her own engagements, as for instance for payment of debts, &c."

After this long train of decisions I can but think, that the law in England ought to have been regarded as firmly settled. Those decisions were based on the clear and distinct principle, that unless the instrument creating the separate estate otherwise provided; a court of equity would regard, that as an incident to her ownership of a separate property, she had a general right to dispose of the same, and for precisely the same reason, as an incident to such ownership, her separate estate was bound for all her debts and personal engagements. That this was the basis of these decisions cannot be reasonably questioned.

Judge Story in his Commentaries on Equity, vol. 2 p. 629, §1401, says, speaking of this subject: "In the earlier cases indeed, the doctrine was put upon the intelligible ground, that a married woman, as to her separate property, is to be deemed a *feme sole*; and that therefore her general engagements, though they would not bind her person, should bind her separate property."

Unbounded mischief and confusion has arisen from an abandonment by some of the English judges of this intelligible ground, and the invention of fancies as the basis, on which a married woman's debts could be charged by a court of equity on her separate estate. It

is true, the English courts have in modern times repudiated all these fancies practically, and have returned substantially to the plain and intelligible ground, on which the old English cases were based.

But unfortunately some of the courts in the United State have in the meantime seized on these fancies and spun them out, till in those States, whose courts have indulged in these fancies, the grounds, on which any debt can be charged on a married woman's estate, are utterly unintelligible ; and as a result no two courts, who have indulged in these fancies, can agree ; and not only is the law different in all these States, that have attempted to follow these fancies, but in the same State these decisions vary constantly, as the judges or the court is changed. I cannot but deprecate the departure of some of the English judges from the intelligible law, which had been laid down in a long train of decisions.

We will now consider those English cases, which for a time unsettled the law in England. The principles laid down in these cases are, that a married woman's separate estate is not liable to the payment of her debts, because liability to the payment of debts is an incident to her ownership of property ; but her separate estate can be disposed of by her as she pleases, such power of disposition being an incident to her ownership of property; and having the power to dispose of it as she pleases, she must have the implied power to charge it with the payment of debts ; and if she exercises this power, then a court of equity will enforce the payment of a debt, so charged, out of her separate estate.

Having reached this conclusion, they proceed further and hold, that if she has executed a bond, or other instrument in writing, promising to pay a particular debt, though she does not thereby charge her separate estate with its payment, nor allude to it in any manner, it will nevertheless be held to be a charge on her separate estate, because the security must be supposed to have been executed with the intention, that it should operate in

some way, and as it is void at law, it can have no operation except as against her separate estate; and therefore the courts will infer, that this was her purpose in executing such writing, and will enforce it, as though she had made the charge; but such intention will not be inferred from her contracting a debt verbally. I cannot comprehend, how this inference is drawn, when she contracts a debt in writing, but is refused to be drawn, when she contracts it verbally. The writing making no mention of her separate estate like any other bond or writing is obviously given merely as evidence of the contract creating the debt; and the inference, that she intended to charge her separate estate, is obviously drawn not from the writing, but from the contract, which was evidenced by the writing; and in reason precisely the same inference must be drawn from her contract creating a debt, though this contract be verbal. The written contract is as void at law as her verbal contract; and the verbal must just as reasonably be supposed to have been entered into with the intention, it should operate in some way; and it too can as much as the written contract have no operation except as against her separate estate. If in the one case the inference is drawn that she so intended, it seems to be an inevitable conclusion, that she equally intended it in the other. And if this intention in the one case is to be held as the equivalent of a direct charge, I cannot see, why it should not be in the other; yet there are a number of English cases, where this distinction between debts evidenced by writing, and those based on verbal contracts, has been taken. These positions are sustained or countenanced by these cases. See *Belton* v. *Williams*, 2 Ves. Jr. 150; *Clerk* v. *Miller*, 2 Atk. 379; *Greatly* v. *Noble*, 3 Madd. 49; *Stuart* v. *Kirkwall*, 3 Madd. 389; *Aguilar* v. *Aguilar*, 5 Madd. 418; *Chester* v. *Platt*, 1 V. & B. 334; *Francis* v. *Wigzell*, 1 Madd. 145.

But these cases seem inconsistent, not only with the numerous authorities before cited, but also with *Anon.*

18 Ves. 258, and *Gregory* v. *Lockyer*, 6 Madd. 90, where decrees were made for the payment of debts generally o married women out of their estates after their death. Their estates could not in principle be held liable for their general debts, after their death, if they were not so liable in the lifetime of the married women. In the case in 18 Ves. 258 it was held, that all the debts of the married woman should be paid ratably ; which would be clearly right, if her separate estate is liable for all her debts, as though she were a *feme sole,* but clearly wrong, if her separate estate was only liable for a debt by reason of an express or implied charge on her part, for then they could only be paid according to the respective priorities of the charges made in their favor severally. But I have nevertheless never seen it suggested, that in administering a married woman's estate a court of equity should do otherwise than pay all debts, that are charges on it, equally.

The recent English cases however repudiate substantially, I think, the doctrine, which these authorities introduced: that a debt could be charged on a married woman's estate, only when she had expressly so charged it, or by having executed her bond or other writing for the payment of the debt, when it would be therefrom implied, she had intended to charge the debt on her separate estate ; and they uphold the old English cases in their view, that the separate estate of a married woman is liable to all her debts, whether they are written or merely verbal. Though not so stated, these cases can be sustained in reason, only on the ground that this liability does not depend on her having either made them charges; or intended to make them charges, but only on the broad ground, that it is incident to her ownership of the estate.

According to the views of both these ancient and modern authorities, when based on their true ground, it is not only unnecessary, but it is incorrect in principle, to speak of a married woman's written engagements as operating merely as appointments. In *Murray* v. *Barlee,*

74

4 Sim. 82, Lord Brougham repudiates such distinctions. He says : "If in respect to a wife's separate estate she is in equity taken as a *feme sole,* and can charge it by instruments absolutely void at law, can there be any reason for holding, that her liability, or more properly her power, of affecting her separate estate should only be exercised by a written instrument? Are we entitled to invent a rule, to add a new chapter to the statute of frauds, and to require writing, when that act requires none? Is there any equity reaching written dealings with the property, which extends not also to dealing in other ways, as by sale and delivery of goods? Shall necessary supplies for maintenance not touch the estate ; and yet money furnished to squander away at play be a charge on it, if fortified by a scrap of writing? No such distinction can be taken on any conceivable principle."

In *Owens* v. *Dickenson,* Cr. and Ph. 48, Lord Cottenham speaking of a written agreement says : "that within the authority of the cases, which have been decided, it would have been operative upon the *feme covert's* separate estate, but not by way of the execution of a power, though that has been an expression sometimes used, and, as I apprehend, very inaccurately used, in cases where the court has enforced the contracts of married women against their separate estate. It cannot be an execution of a power, because it neither refers to the power nor to the subject matter of the power, nor indeed in many cases has there been any power existing at all. Besides, as it was argued in *Murray* v. *Barlee,* if a married woman enters into several engagements of this sort, and all the parties come to have satisfaction out of her separate estate, they are paid *pari passu;* whereas if the instruments took effect as appointments under a power, they would rank according to the priorities of their dates. It is quite clear therefore, that there is nothing in such a transaction, which has any resemblance to the execution of a power; what it is, it is not easy to define.

"It has sometimes been treated as disposing of the par-

ticular estate; but the contract is silent as to the separate estate, for a promissory note is merely a contract to pay, not saying out of what it is to be paid, or by what means it is to be paid; and it is not correct according to legal principles, that a contract to pay is to be construed into a contract to pay out of a particular property, so as to constitute a lien on that property. Equity lays hold of the separate property, but not by virtue of anything expressed in the contract; and it is not very consistent with correct principles, to add to the contract that, which the party has not thought fit to introduce into it.

"The view taken of the matter by Lord Thurlow in *Hulme* v. *Tenant* is more correct. According to that view, the separate property of a married woman being a creature of equity, it follows, that if she has a power to deal with it, she has the other power incident to property in general, namely : the power of contracting debts to be paid out of it ; and inasmuch as her creditors have not the means at law of compelling payment of those debts, a court of equity takes upon itself, to give effect to them, not as personal liabilities, but by laying hold of the separate property as the only means, by which they can be satisfied.

"I observe, that in *Clinton* v. *Wills*, (1 Sugd. Powers 208 n.) Sir Thomas Plumer suggested a doubt, whether it was necessary, they should be secured by writing ; and it certainly seems strange, that there should be any difference between a contract in writing, when no statute requires it to be in writing, and a verbal promise to pay. It is an artificial distinction, not recognized in any other case."

In the case of *Vaughan* v. *Vanderstegen*, 2 Drew. 183, cited in White & Tudor's Leading Cases in Equity, 4th American from 4th London edition, top page 696, side page 501, Sir R. T. Kindersley V. C. says : "It has not yet indeed been made the subject of positive decision, that the principles of courts of equity, by which a married woman is constituted a *feme sole* as to her separate prop-

erty, embrace her verbal engagements or cases of common *assumpsit*; and in the 7th edition of Lord St. Leonard's work on Powers, published in 1845 (1 Sugd. Pow. 206), his lordship observes (though without reference to *Murray* v. *Barlee,* or *Owens* v. *Dickenson*) that the prevailing opinion then was, that her separate estate was not liable to general demands upon her. Considering however the opinions I have referred to, and the reason of the thing, I think it very probable, that when that question arises for decision, it will be decided in the affirmative."

Subsequently this very subject was fully discussed in the important cases of *Johnson* v. *Gallaher,* 3 De G. F. & J. 494; 30 L. J. (N. S.) Ch. 298; 7 Jur. (N. S.) 273; 9 W. R. (L. J.); and the judgment of Lord Justice Turner may be considered as the most accurate exposition of the law thereon. It is thus summed up and adopted by Sir R. T. Kindersley V. C., (See White & Tudor's Leading Cases in Equity, vol. 2, top page 697, side page 501.) : "I think the principle laid down by Lord Justice Turner, in *Johnson* v. *Gallaher,* is a sound one ; and it is the principle which this court ought to adopt. As I understand that principle it is this :—If a married woman having separate property enters into a pecuniary engagement, whether by ordering goods, or otherwise, which, if she were a *feme sole,* would constitute her a debtor, and in entering into such engagement, she purports to contract, not for her husband, but for herself, and on the credit of her separate estate, and it was so intended by her, and was so understood by the person with whom she was contracting, that constitutes an obligation, for which the person, with whom she contracts, has the right to make her separate estate liable; and the question, whether the obligation was contracted in the manner I have mentioned, must depend upon the facts and circumstances of each particular case.

"It is clearly not necessary, that the contract should be in writing, because it is now admitted, if a married woman

1878
June Term.

Radford *et al.*
v.
Carwile *et al.*

enters into a verbal contract, expressly making her separate estate liable, such contract would bind it; nor is it necessary, there should be any express reference made to the fact of there being such separate estate; for a bond or promissory note given by a married woman, without any mention of her separate estate, has long been held sufficient to make her separate estate liable. If the circumstances are such as to lead to the conclusion, that she was contracting not for her husband but for herself, in respect to her separate estate, that separate estate will be liable to satisfy the obligation." *Mrs. Mathewman's case,* 3 Law Rev. Eq. 187; and see also *Hartford* v. *Power,* 3 W. R. Eq. 602; *Picord* v. *Hine* 5 L. R. ch. App. 274, referred to in White & Tudor's Leading Cases in Equity, volume 2, side page 502, top page 697.

It would seem therefore to be the settled law of England, that a married woman's separate estate, when not otherwise provided in the deed of settlement, is liable to all her debts, whether in writing or not; and that if not restrained, she has the unlimited power to dispose of her separate property both real and personal, as she pleases. In addition to the authorities, I have already referred to as sustaining this last position, I would refer to *Powell* v. *Hankey,* 2 P. Wms. 82 ; *Squire* v. *Dean,* 4 Bro. C. C. 326 ;. *Smith* v. *Camelford,* 2 Ves. Jr. 698 ; *Dalbiach* v. *Dalbiach,* 16 Ves. 126 ; *Ridout* v. *Lewis,* 1 Atk. 269 ; *Ellis* v. *Atkinson,* 3 Bro. C. C. 566 ; *Clarke* v. *Pistor,* 3 Bro. C. C. 347 note ; *Chesslyn* v. *Smith,* 8 Ves. 185 ; *Caverly* v. *Dudley & Bisco,* 3 Atk. 541 ; *Sturgis* v. *Corp,* 13 Ves. 190 ; *Heatley* v. *Thomas,* 15 Ves. 596 ; *Sperling* v. *Rochefort,* 8 Ves. 164; *Wagstaff* v. *Smith,* 9 Ves. 520 ; *Parkes* v. *White,* 11 Ves. 209; *Hovey* v. *Blakeman,* cited in *Wagstaff* v. *Smith,* 9 Ves. 524 ; *Brown* v. *Like,* 14 Ves. 302 ; *Bullpin* v. *Clarke* 17 Ves. 365.

The cases very generally go further than laying down the proposition, that a married woman is considered in equity with respect to her separate property as a *feme sole,* and as such has an absolute dominion or power of

1878
June Term.

Radford et al.
v.
Carwile et al.

disposition over it, unless her power of disposition be restrained by the deed, or will, under which she became entitled to it. And they sustain the position, that though a particular mode of disposition, or enjoyment, of the property be specified in the instrument creating the separate estate, yet from this there cannot be implied the exclusion of the right to pursue any other mode of disposition or enjoyment. The maxim *expressio unius exclusio alterius* must yield according to these cases to the natural inference, that the gift of an unqualified right of ownership carries with it the equally unlimited power to dispose. And accordingly these cases hold substantially, that the granting of one mode of disposition is not to be construed, as in any manner limiting the general power of the wife to dispose of her separate estate in any manner she pleases. See *Parkes* v. *White*, 11 Ves. 222; *Pybus* v. *Smith*, 1 Ves. Jr. 189; *Witts* v. *Dawking*, 12 Ves. 501; *Brown* v. *Like*, 14 Ves. 302; *Sturgis* v. *Corp*, 13 Ves. 190; *Acton* v. *White*, 1 Sim. & St. 429; *Vallet* v. *Armstrong*, 4 Beav. 319; *Stanford* v. *Marshall*, 2 Atk. 68; *Grigby* v. *Cox*, 1 Ves. Sr. 517; *Cartony* v. *Nieman*, 3 Bro. 346; *Clarke* v. *Pistor*, 3 Bro. 346; *Ellis* v. *Atkinson*, 3 Bro. C. C. 565; *Sperling* v. *Rochfort*, 8 Ves Jr. 164.

But this construction has been denied in some English cases; and the inference to be drawn from them is, that the granting expressly of power to dispose of her separate estate in one particular mode is an implied prohibition to dispose of it in any other mode. See *Caverly* v. *Dudley* & *Bisco*, 3 Atk. 541; *Socket et ux.* v. *Wray*, 4 Bro. 483; *Hyde* v. *Price*, 3 Ves. 437; *Milne* v. *Bush*, 3 Ves. Jr. 488; *Whistler* v. *Newman*, 4 Ves. 129; *Mores* v. *Huish*, 5 Ves. 692 (overruled in *Essex* v. *Atkins*, 14 Ves. 542); *Hovey* v. *Blakeman* cited 9 Ves. 524, but overruled in *Sturgis* v. *Corp*, 13 Ves. 190.

The decided weight of the English authorities is against these views; yet several of the English judges, while deciding that the English law was settled in opposition to

1878
June Term.

Radford et al.
v.
Carwile et al.

the views expressed in the cases last above cited, regretted that it was so settled. Lord Thurlow expressed such views in *Ellis* v. *Atkinson*, 3 Bro. C. C. 347, note ; *Pybus* v. *Smith*, 3 Bro. C. C. 340, 1 Ves. Jr. $89; and Lord Eldon expressed such views in *Sperling* v. *Rochfort*, 8 Ves. 164 ; *Jones* v. *Haines*, 9 Ves. 497; *Parkes* v. *White*, 11 Ves. 188 ; and induced by these disapprovals of the full extent, to which the English courts have gone, the courts in some of our states have not only adopted the views of these judges, who disapproved of the current of the English decisions, but have gone further and held, that the *jus disponendi* could not be implied from the ownership by a married woman of a separate estate, even where no limitation was put on her power of disposition.

The second view of the law on the subject under consideration differs entirely from the view sustained by the English authorities. The first State, which adopted this view, in opposition to the whole current of English decisions, was South Carolina. In 1811 Chancellor Desaussure, in the case of *Ewing* v. *Smith*, 3 Desau. (S. C.) 417, after a review of many of the old English decisions, decided the law to be substantially, as I have stated it to be held by the English authorities. He sums up the result of his examination thus : "The result then is, that a *feme covert*, entitled to a separate estate in possession, remainder or reversion, is held to be a *feme sole* to the extent of the separate property ; and the *jus disponendi* follows of course. She may give it to whom she pleases, or charge it with debts of her husband, where no undue control is used over her. And her disposition will be sanctioned, or enforced, by the court, even without the assent of the trustees, unless this assent be made specially necessary by the deed or will creating the separate estate. And this power of disposing of the separate estate is not restricted by the deed, or will, pointing out a particular mode of disposing, or charging, the particular estate, unless the deed, or will, negatives any other mode expressly."

I concur with the Chancellor in the opinion, that

"upon the fullest and most attentive examination of the English cases, these positions are clearly made out and established."

This case was appealed from and decided by the Court of Appeals of South Carolina in 1813, and was reversed by a divided court, three being for its reversal and two for its affirmance. The majority expressly admit, that the views af Chancellor Desaussure are in strict conformity to the English decisions; but regarding the question as *res integra* in this country they declined to follow these decisions preferring to follow the views of Lord Thurlow and Lord Eldon, who while admitting the law to be settled expressed the opinion that if the question was *res integra*, they would decide it differently.

The conclusion reached by Judge Waties, who delivered the opinion of the majority of the court is thus expressed : " I may therefore confidently say, that even if Lord Thurlow and Lord Eldon were now sitting on this bench, and called on to settle the law for *this community*, they would settle it on these principles. Instead therefore of opposing this high authority, I feel expressly authorized by them in declaring the opinion, that a married woman, who has a separate estate, cannot part with it, or charge it in any way, without an examination ; that as by marriage she loses all the power of a *feme sole*, a separate estate does not confer all those powers on her; and therefore the power of appointing such estate must be expressly given, and the mode prescribed be strictly pursued. As the bond given by Mrs. Smith, had not these sanctions, I am of opinion, that it ought not to be enforced."

These views were confessedly and obviously directly opposed to the current of English authorities both ancient and modern. The judge in delivering his opinion says: " But neither before the revolution, no more than since, was this court ever bound to servile adherence to precedents of the English court. This court ought to be independent of every other in the exercise

of its judgment." And again : " It is indeed true as a

general rule, that an absolute right of property gives an absolute right of disposition ; but this rule is applicable only to persons of full legal capacity ; and it is strange, that any English judge should have ever lost sight of the common law so far as to apply it to married women."

This new doctrine, thus boldly laid down as such, has since been followed in South Carolina. See *Magwood & Patterson* v. *Johnston et al.*, 1 Hill (S. C.) Ch. 228; *Robinson* v. *Ex'rs of Dart*, Dudley, (S. C.) Ch. 128 ; *Reid* v. *Lamar*, 1 Strobh. (S. C.) Eq. 27 ; *Rochell* v. *Tompkins*, 1 Strobh. (S. C.) Eq. 114. But in South Carolina the English rule, which has been everywhere adopted to this extent, is followed: that if the instrument creating the separate estate expressly authorizes the *feme covert* to alienate it, or expressly makes it liable to the payment of her debts, the court will hold, that it is subject to her alienation or debts. See *Clark* v. *Makenna*, 1 Cheves (S. C.) Ch. 163. And it is further held, that a trust estate is liable for debts incurred for its use and on its account ; and that on this principle a married woman's separate estate may be charged with a debt incurred, when the money has been expended for the benefit of the separate estate, or has defrayed charges, for which it was bound. See *Cater* v. *Eveleigh*, 4 Desau. 19; *James* v. *Magrant*, *Id.* 591, *Montgomery* v. *Eveleigh et al.*, 1 McCord (S. C.) Ch. 267 ; *Adams* v. *Mackey*, 6 Rich. (S. C.) Eq. 75.

The law of South Carolina is entirely settled, as appears from the case *Reid* v. *Lamar*, 1 Strobh. (S. C.) Ch. 27. It was there decided, that an estate settled to the separate use of a *feme covert*, to be at her full and free disposal, was yet not chargeable upon a note given by her and her husband. Harper, Chancellor, in delivering the opinion states clearly the law of that State. He says: "If anything can be considered as settled, it is the settled law of this State, that where property is given, or settled, for the separate use of a married woman, she has no power to charge, encumber or dispose of it, unless in so far as

75

power to do so has been conferred on her by the instru‐ment creating the estate, which power must be strictly pursued, in contradiction to many English cases. With respect to the decision in *Ewing* v. *Smith*, even those, who dissented from it on the score of authority, acknowl‐edged the wholesomeness of its operation and its tendency to promote the objects, which courts of equity had in view in recognizing a separate property in *femes covert*, and protecting them against the influences or practices of their husbands, which might be exercised without the possibility of detection; and also to guard against their own generous or devoted impulses * * * * Though it has been sometimes said in relation to *our* doctrine, that a married woman is only a *feme sole sub modo*, or to the extent that the settlement makes her so; yet these ex‐pressions are inaccurate; she can in no manner of respect be considered a *feme sole*. A *feme sole* disposes of, or charges, her property by her own act, and according to her own will, by her inherent power as owner; a *feme covert* exercises a *delegated* authority, and can not exceed it; she is enabled to execute a power, as in some instances, any third person—*feme covert* or other — even those having no interest in the property, might be enabled to execute it, and bind her by their act."

We need not dwell on this South Carolina doc‐trine further. It has at least the merit of being clear, precise and easy of application. It was confessedly a novelty; and it has not been followed either in Vir‐ginia or West Virginia. It has however been fol‐lowed in Pennsylvania, Rhode Island, Tennessee and Mississippi. See *Lancaster* v. 1 *Dolan*, Rawle (Pa.) 231; *Lyne's ex'r* v. *Crouse et al.*, 1 Barr (Pa.) 111; *Rogers* v. *Smith*, 4 Barr 93; *Wright* v. *Brown*, 8 Wright 224; *Wells* v. *McCall*, 14 P. F. Smith 207; *Thomas* v. *Fol‐well*, 2 Whart. 11; *Wallace* v. *Costen*, 9 Watts 137; *Met‐calf* v. *Cook*, 2 R. I. 355; *Ware* v. *Short*, 1 Swann 489; *Morgan* v. *Elam*, 4 Yerg. (Tenn.) 375; *Marshall* v. *Stephens et al.*, 8 Humph. (Tenn.) 159; *Litton* v. *Baldwin*

*et al.*, 8 Humph. (Tenn.) 209; *Kirby* v. *Miller*, 4 Caldw. (Tenn.) 4; *Armstrong* v. *Stoval*, 26 Miss. 275; *Dotey et. al.* v. *Mitchell*, 9 Smed. & M. (Miss.) 435; *Montgomery et al.* v. *The Agricultural Bank*, 10 Smed. and M. 567.

Of course when these doctrines prevail, the separate estate of a married woman cannot be charged with her debts of any sort, even by her, unless she be authorized to make such charge expressly; and her debts, whether evidenced by writing or not, cannot be made out of such separate estate. See *Dominee* v. *Scott*, 3 Wharton 309; *Lancaster* v. *Dolan*, 1 Rawle 231. These cases need not be examined by us in detail; they are all based on the principles followed out in South Carolina, principles not recognized by our courts, or most of the courts in this country or in England.

A third view of the law on the subject under discussion has been taken by the courts of New York and some other States. In 1817, in the case of *The Methodist Episcopal Church* v. *Jaques*, 3 Johns. Ch 77; Chancellor Kent reviewed very thoroughly nearly all the English decisions, which had then been rendered on the subject.

He says on page 89: "The English cases are certainly in favor of the position, that a married woman is considered in equity with respect to her separate property, as a *feme sole,* and is held to have an absolute dominion, or power of disposition over it, unless her power of disposition be restrained by the deed or will, under which she became entitled to it." This position it will be observed is diametrically opposed to the views taken by the South Carolina Court of Appeals in *Ewing* v. *Smith,* decided a few years previous, but not referred to by Chancellor Kent.

On the question, whether the express authorizing of her by such deed, or will, to dispose of, or charge, her separate property is to be construed, as an implied prohibition of her right to dispose of her separate estate, or charge it, in any other mode, he admits that the weight of English authorities is opposed to such implied prohibition, but

require an express prohibition to prevent her from exercising her general power of disposition, as she pleases, as an incident to her ownership of the property. But he shows, there are some English decisions the other way; and Lords Thurlow and Eldon, while they followed the current of English decisions, regretted that the decided cases compelled them to this course. He regards therefore the English decisions on this subject as so unsatisfactory as to leave him at liberty to disregard the current of English decisions, and to adopt what he deemed the true principle.

His conclusions are thus expressed, (see p. 113) : "I apprehend we may conclude, (though I do it with unfeigned diffidence, considering how great talents and learning, by a succession of distinguished men, have been exhausted on the subject) that the English decisions are so floating and contradictory, as to leave us the liberty of adopting the true principle of these settlements. Instead of holding that the wife is a *feme sole,* to all intents and purposes, as to her separate property, she ought only to be deemed a *feme sole sub modo,* or to the extent of the power clearly given her by the settlement. Instead of maintaining that she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the proposition would be more correct, that she has no power, but what is specially given, and to be exercised only in the way prescribed, if any such there be. Her incapacity is general; and the exception to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of the law. These very settle. ments are intended to protect her weakness against her husbands power, and her maintenance against his dissipation. It is a protection, which the court allows her to assume, or her friends to give ; and it ought not to be rendered illusory. The doctrine runs through all the the cases, that the intention of the settlement is to govern, and that it must be collected from the terms of the in-

strument. When it says she may appoint by will, it does not mean she may likewise appoint by deed; when it permits her to appoint by deed, it cannot mean, that giving a bond or note, or a parol promise without reference to the property, or making a parol gift, is such an appointment. So when it says, she is to receive from her trustees the income of her property, as it from time to time may grow due, it does not mean, that she may, by anticipation, dispose of all that income. Such a latitude of construction is not only unauthorized by the terms, but it defeats the policy of the settlement, by withdrawing from the wife the protection intended for her. *Perhaps we may say, that if the instrument be silent as to the mode of exercising the power of appointment or disposition, it intended to leave it at large to the discretion and necessities of the wife; and this is the most that can be inferred."*

1878
June Term.

Radford et al.
v.
Carwile et al.

It will be observed, that while the views entertained by Chancellor Kent were similar to those taken by the Court of Appeals of South Carolina in *Ewing* v. *Smith*, he was unwilling to take the extreme position taken by it, and to disregard entirely the current of English authority.

An appeal was taken from the decision of Chancellor Kent in this case, and decided in the Appellate Court in 1820. See Johnson's Reports, vol. 17, p. 548. The case was ably and elaborately argued by counsel; and I will state their respective views as ably presenting the strongest grounds, on which the opposite views of the law is based. I do not pretend to give anything more than the principles, insisted on by them, and the reasons, which they respectively gave for their adoption.

For the appellants it was insisted, that the English Chancery Court adopted much of its principles and practice from the civil law; that the equity doctrine of a separate estate of a married woman was taken from the civil law in reference to a married woman's *paraphernal* property; and by that law she could at her pleasure dispose of such property, or its revenues without the

1878
June Term.

Radford *et al.*
v.
Carwile *et al.*

authority of her husband.   Having taken the notion of
a separate estate of a wife from the civil law, it was
natural for the English Chancery Court to adopt the
whole of this law, as it stood in the Codes of every State
in Europe, that adopted this civil law.   They did not
intend, when they restricted the husband from his right,
also to restrain the wife, and put her under disabilities
not flowing from the *Roman* law.   But to bind the courts
of common law, they had to resort to the well known
agents of a court of chancery, *trustees,* as mere instru-
ments of conveyance, like trustees to preserve contingent
remainders, &c.   In late years some Chancellors fell into
the error, that trustees were created for the protection
of the wife, "to constitute perhaps the only efficient
shield against the undue, secret, and powerful influence
of the husband."   They were really introduced merely
to avoid the principles of the common law; not to be-
come the councellors and champions of the wife against
the husband.   The idea of trustees in matters of prop-
erty to control the wife's impulses of affection or duty
is dangerous to the peace and happiness of society.   If
fraud, imposition, duress or undue influence is shown,
the court would protect her, as it does others; otherwise
she ought to control her separate property at her
pleasure; and the general rules of a court of equity in
reference to such property ought not to be based on the
supposition, that husbands will be guilty of such con-
duct.   The law of the separate estate of a married
woman is not based on any idea, that she needs protection
from the fraud and undue influence of her husband.   If
she or her friends in any particular case suppose, that
she needs protection of this character, they may impose
restraints on her powers expressly in the instrument
creating the estate; and such restraints so imposed the
courts will enforce.   But such restraints being not in
harmony with the general law on the subject, they will
never be implied.   To imply it from the direction to
the trustees from time to time to pay the rents into

the hands of the wife, or that she may dispose of the property by will, or the like, would be to violate the fundamental principle of law, that the owner of any property has a right to dispose of it at his or her pleasure. The same necessity, which led to the introduction of trustees, as mere conduits of conveyances, to avoid the rule of common law, led to the mode of giving to the wife the *power of appointment*; a power intended for the *enlargement* and not the restriction of her rights. They were originally adopted as the means, by which a wife might exercise her right of ownership, and when, it was supposed, it might be necessary to adopt some such means. But the courts very soon held it unnecessary, that such means should be provided, as she by reason of her ownership had a right to dispose of her property, though no power of appointment was provided in the settlement. But from the early habit adopted of inserting such powers it was continued after it was clearly unnecessary to insert them. But to construe any power of appointment in a specified manner, as a limitation on her right to dispose in any manner, would be to convert, what was intended as an enlargement, or making certain her power, into a limitation upon it. Such limitation can only exist, where it is expressly inserted as a limitation.

These were substantially the views of appellant's counsel.

The appellee's counsel insisted: That the forms imposed in the execution of a power are intended to preserve the person, to whom the power is given, from a hasty or unadvised execution of a power. The expression of a particular mode of executing a power excludes every other mode of doing it. It is a restraint on the weakness of the wife; and intended to protect her from the power of her husband, whose influence over her is greater in proportion to their mutual love and attachment. Negative words, it is admitted, would limit her power. But in principle negative words can make no

difference. Her power being derived from the instrument must be governed by it. There never was a trust deed, that did not place a restraint on alienation. The very creation of a trust imposes a restraint. If the appellant's doctrine prevails, there must be an end to all trust estates, the shield, that was intended to protect the wife, would be taken away.

The court overruled the decision of Chancellor Kent, three senators dissenting. Spencer, Chief Justice, in his opinion page 578 says: "I have examined the case with the unfeigned respect, I always feel for the learned Chancellor, who has denied the right of Mrs. Jaques to dispose of her estate, without the consent or concurrence of her trustee; and I am compelled to dissent from his opinion and conclusions. From the year 1740, to the year 1793, (with the single exception of the opinion of Lord Bathurst, in *Hulme* v. *Tenant*, which was reversed by Lord Thurlow) there is an unbroken current of decisions, that a *feme covert* in respect to her separate estate is to be regarded in a court of equity as a *feme sole*, and may dispose of her property without the consent or concurrence of her trustee, unless she is specially restrained by the instrument, under which she acquires her separate estate. There are nearly twenty cases decided by Lord Hardwick and Lord Thurlow, containing the principle, I have stated, and which I shall not weary the patience of the court by citing. The case of *Sockett* v. *Wray*, 4 Bro. 483, before Sir R. P. Arden, Master of the Rolls, in 1793, was the first case to break the continuity of decisions. This formed a precedent for the case of *Hyde* v. *Price*, 3 Ves. Jr., 437, and then followed the case of *Whistler* v. *Newman*, 4 Ves. Jr., 129; decided by Lord Loughborough.

"In *Whistler* v. *Newman*, Lord Loughborough admitted, that the court had gone the length, and he was bound by them, that if a married woman has separate property, she may dispose of it, and the trustees are bound to follow her disposition. In *Mores* v. *Huish*, his Lordship distinguished it from the preceding cases.

1878
June Term.

Radford et al.
v.
Carwile et al.

"These cases are succeeded by many others, after Lord Eldon became chancellor, in which he restored the law to its first and ancient principle. In the case of *Parkes* v. *White*, 11 Ves Jr. 209, he reviewed all the cases, and strongly intimated that the decision in *Whistler* v. *Newman*, was in opposition to all the authorities for a century. He laid down the rule to be, that a married woman, having an estate for her separate use, is capable of disposing of it, provided the transaction is free from fraud, and no unfair advantage is taken of her.

" The mistake, into which I think the Chancellor has fallen, consists in considering Mrs. Jaques restrained from disposing of her estate in any other way, than that mentioned in the deed of settlement. The laws, in my apprehension, are clearly opposed to this distinction; and I am entirely satisfied that the established rule in equity is, that when a *feme covert* having separate estate enters into an agreement *and sufficiently indicates her intention to affect by it her separate estate,* when there is no fraud, or unfair advantage taken of her, a court of equity will apply it to the satisfaction of such engagement. This was the principle adopted by Lord Hardwick in *Grigby* v. *Cox*, 1 Ves. Sr. 517 and the same doctrine prevailed in *Pybus* v. *Smith, Ellis* v. *Atkinson* and in *Nieman* v. *Cartory*, 3 Bro. 340, 346.

In *Pybus* v. *Smith,* Lord Thurlow observed, if a *feme covert* sees what she is about, the court allowed of the alienation of her separate property. The same principle was adopted in *Fettiplace* v. *Gorges*, 3 Bro. C. C. 8; 1 Ves. Jr. 146, and in *Wagstaff* v. *Smith,* 9 Ves. Jr. 520: " It seems to me the power reserved to Mrs. Jaques, by deed, has been misconceived. I understand it, that during her life her estate is to be at her absolute disposal, with a further power to grant and devise it by her last will and testament; *but if the power of disposition was specifically pointed out, it would not preclude the adoption of any other mode of disposition, unless there were negative*

1879.
Special Term.

Radford et al.
v.
Carwile et al.

*words restricting the exercise of that power, but in the very mode pointed out."*

It will be observed that these conclusions accord entirely with my understanding of the English authorities, except that Chief Justice Spencer thinks, that in order that a married woman's agreement may be enforced against her separate estate, she must sufficiently indicate her intention by the agreement to affect her separate estate. I do not think that any such limitation can be deduced from the English authorities. It certainly cannot from the old English authorities; and though such views were afterwards thrown out in several cases, yet they have been since, I think, in substance repudiated, and the old doctrine acted upon, which makes her engagements binding on her, though it does not appear, that she thereby intended to bind her separate estate. It is true, that most of the strongest cases, which indicate clearly a return to the ancient decisions on this point, have been decided since 1820, when this New York case was decided.

Platt J. in his opinion in *Jaques* v. *The Methodist Episcopal Church* 17 Johns. 585, is still more explicit; and no such qualification of the English doctrine, as is indicated by Justice Spencer, is to be deduced from his opinion. His language is: "The *jus disponendi* is incident to her separate property and follows by implication. She may give it to whom she pleases, or charge it with the debts of her husband, provided no undue influence is exerted over her; and her disposition will be sustained and enforced by a court of equity, without the assent of her trustee, unless that assent be expressly made necessary by the instrument creating the trust. And the specification of any *particular mode* of exercising her disposing power, does not deprive her of any other mode of using that right, not expressly or by necessary construction *negatived* in the devise or deed of settlement (*Powell v. Hankey*, 2 P. Wms. 82; *Squire v. Dean*, 4 Bro. C. C. 326; *Smith v. Camelford* 2 Ves.

Jr. 698; *Brodie v. Barry* 2 V. & B. 36; *Dalbiach v. Dalbiach*, 16 Ves. 126 ; *Peacock v. Monk*, 2 Ves. Sr. 190 ; *Norton v. Turville*, 2 P. Wms. 144; *Ridout v. Lewis*, 1 Atk. 269 ; *Stanford v. Marshall*, 2 Atk. 69; *Allen v. Papworth*, 1 Ves. Sr. 163; *Penne v. Peacock case temp.* Talb. 41; *Grigby v. Cox*, 1 Ves. Sr. 517 ; *Pawlet v. Delaval*, 2 Ves. 663 ; *Niemann v. Cartoney*, 3 Bro. 347 ; *Hulme v. Tenant*, 1 Bro. C. C, 16; *Pybus v. Smith*, 3 Bro. C. C. 340 ; *Heatley v. Thomas*, 15 Ves. 596; *Fettiplace v. Gorges*, 3 Bro. C. C. 8."

The case before the court was of an alleged parol gift by wife of a portion of her separate estate to her husband, and a parol agreement, that their family expenses to be incurred by her husband should be charged on her separate estate. The point decided in this case, *that the specification of a particular mode, by which a wife may dispose of her separate property, does not deprive her of the right to dispose of it in any other mode, unless any other mode of disposition is necessarily, or by construction, negatived by the instrument creating the separate estate*, has been ever since followed in the New York courts. See *Gardner v. Gardner*, 22 Wend. 526 ; *Vanderheyden v. Mallory*, 1 Coms. 462; *Strong v. Skinner*, 4 Barb. (N. Y.) 546, 553; *Fireman Insurance Company of Albany v. Bay*, 4 Barb. (N.Y.) 407 ; *Guild v. Peck*, 11 Paige (N. Y) Ch. 475 ; *Whitcall v. Clark*, 2, Edw. (N. Y.) Ch. 149.

We need not comment specially on these cases. They establish the right of a wife to dispose of her separate estate at her pleasure, except where her right to do so is expressly, or by necessary implication, *negatived* by the instrument creating her separate estate. But the other point referred to by Chief Justice Spencer, that before an agreement creating a debt can be binding on the separate estate of a married woman, *she must sufficiently indicate her intention to affect her separate estate by it*, has since become the fruitful source of discussion in the New York courts; and many nice distinctions have been taken, as to what should be regarded as *sufficiently indicating her intention to bind her separate estate*.

The old as well as modern English cases, as we have

seen, did not require any specific indication of such intention. Her engagements and debts are there charged on her separate estate, simply because it is incident to her ownership of separate property, that it should be liable to the payment of her debts without any reference to her purpose of charging them on her separate estate. This is the English doctrine.

In South Carolina too her intention to charge her separate estate with a debt is entirely disregarded: their doctrine being her separate estate is liable for none of her debts, unless specifically made so by the deed creating her separate estate; and then it is so liable without any reference to her intention to charge it therewith. If then the deed authorized her to charge her separate estate, she could only do it by a specific execution of the power; and no proof of her intention could be substituted for this express charge, which the courts in such case would require.

This doctrine of requiring the intention of a married woman to charge her separate estate with a debt, before it can be bound, is a doctrine unknown to the English courts of the present day, as I understand their decisions, or to the South Carolina courts. It is the third view of the law on this subject, to which I have alluded, and we must examine the New York cases especially, to understand this view and the many nice distinctions, as to what should be deemed sufficient to prove this intention of a married woman to charge her separate estate.

The leading case on this subject is *Yale* v. *Dederer;* but before this case arose, the Court of Appeals of New York had decided in *Vanderheyden* v. *Mallory*, 1 Com. 462, that the separate estate of a married woman was not bound for her debts contracted before her marriage, unless after her marriage she had charged it on her separate estate by an appointment, that is, as I understand that court, by some act of hers after marriage, *which indicated an intention* to charge her separate property. Chief Justice Jewett, in delivering the opinion of the court

says: "Courts of equity hold, that her *general* personal engagements will not affect her separate property. But in consequence of the principle established, that a married woman may take and enjoy property to her separate use courts of equity enable her to deal with it as a *feme sole*. The right of disposition or appointment is an incident belonging to such interest and power. She may sell, pledge or encumber her separate estate, when she shows an *intention* so to dispose of it, in the same manner as if she were *a feme sole*, unless specially restrained by the instrument under which she acquires it; and every security thereon executed by her is deemed to be an appointment *pro tanto* of the separate estate. *Hulme* v. *Tenant*, 1 Bro. C. C. 16; *Fettiplace* v. *Gorges*, 1 Ves. Jr. 46; 2 Story's Eq. Jur. §§1392, 1399; *Jaques* v. *The Methodist Episcopal Church*, 17 Johns. 549; *Gardner* v. *Gardner*, 22 Wend. 526.

"The great difficulty is to ascertain what circumstances, in the absence of any positive expression of the *intention* to charge her separate estate, shall be deemed sufficient to create such a charge, and what sufficient to create only a general debt. But it is agreed, that there must be an *intention* to do so; otherwise the debt will not affect her separate estate. The fact, that a debt has been contracted by a woman during her coverture, either as a principal or a security, for herself or for her husband, or jointly with him, seems ordinarily to be *prima facie* evidence to charge her separate estate without any proof of positive agreement or intention so to do. 2 Story Eq. Jur. §1400."

Following this expression of opinion by the court, the Supreme Court of Appeals of New York, in 1855 decided in the case of *Yale* v. *Dederer*, 21 Barb. 286, that when a married woman having separate property joins with her husband in giving a promissory note, even as surety for him, she charges thereby her separate estate, though it be not referred to in the note. The position taken by the court is, that a married woman's separate property is not liable for her debts and general engagements; unless she

1879<br/>Special Term.<br/><br/>Radford *et al.*<br/>v.<br/>Carwile *et al.*

has expressly or by implication charged them on her estate. There must be an intention to charge, they say, or the debt will not affect her separate estate. They say, that ordinarily this intention to charge will be inferred from her contracting a debt during coverture, either as principal, or surety of her husband, or jointly with him. This decision was appealed from, and reversed' by .the Court of Appeals of New York in 1858, see 18 N. Y. 265, by a divided court.

Judge Comstock in that case says : " The contract of a married woman being void at law, the difficulty of subjecting her estate in equity to a note or bond was felt by the court as very great. The difficulty however was overcome ; and the rule must now be regarded as settled, that the written engagements of a married woman, entered into on her own account, to pay money are to be satisfied out of her separate estate. *North American Coal Co.* v. *Dyett,* 7 Paige 9; *Heatley* v. *Thomas,* 15 Ves. 596; *Bullpin* v. *Clarke,* 17 Ves. 365; *Stuart* v. *Kirkwall,* 3 Madd, 200 ; *Owens* v. *Dickenson,* 1 Cr. & Ph. 48; 2 Story's Eq. §1400. Where the obligation is not on her own account, and in no sense for the benefit of her estate, the question, whether a charge is thereby created, must depend, I think, on the principle, which lies at the foundation of the rule just stated. *If the note or bond of a feme covert is to be taken as a particular appointment of her estate to pay it, in the nature of an execution of a power of disposition, then I see no reason for a distinction, when she is a surety merely.* This was the theory of some of the cases on the subject ; but this was obviously a mere fiction.

" A simple engagement to pay money is not in its nature an engagement to pay out of any particular fund, and cannot, except by a fiction, be regarded as an appointment or disposition of the fund. There is also the further difficulty, which was suggested by Lord Cottenham in *Owens* v. *Dickenson,* 1 Cr. & Ph. 48, that if a married woman has contracted several debts in writing, and the instruments are to be regarded as appointments of her estate, the creditors would take priority according to the

date of the several instruments. The contrary is plainly true. The creditors of a *feme covert* have no priority over each other, unless it be acquired by superior diligence in proceeding to obtain satisfaction, or by some specific lien expressly created for the purpose. Again, as the law is now with us, since the statute of 1849, suppose before or after marriage she takes real or personal property by inheritance or as distributee; in such a case the fiction of appointment under a power, when she disposes of such estate, is too absurd to be for a moment entertained.

"The earliest cases on the subject proceed on a more intelligible principle, which did not require the aid of a fiction. Thus in *Norton* v. *Turrille*, 2 P. Wms. 145, payment of a married woman's bond, given for money borrowed by her, was decreed out of her separate estate, on the ground that it was deemed to be held in trust for the payment of her debts. This was regarded as one of the separate uses for which the trust was created. So in *Peacock* v. *Monk*, 2 Ves. Jr. 193, Lord Hardwick said: 'if a wife, having an estate to her separate use, borrowed money and gave a bond for its payment, this would give a foundation to demand the money out of her separate estate.' So also in *Hulme* v. *Tennant*, 1 Bro. C. C. 29, Lord Thurlow held, that the trustees of a married woman's estate were obliged in equity to apply it to the satisfaction of her *general engagements*. These early cases did not suggest the fiction of an appointment, but proceeded on the notion of a trust, and the plain equity of requiring a married woman's engagements, entered into for her own benefit, to be satisfied out of the trust estate. Afterwards that fiction was resorted to, which, besides the objection to it as a mere assumption having not the slightest foundation in fact, worked the actual injustice of rejecting the claims of the creditors, whose demands were based on a general *assumpsit* for money had and received, where there was no written engagement to pay. In such cases the fiction of appointment was too grave to be received, and therefore, as there was no appointment,

1879
Special Term.

Radford et al.
v.
Carwile et al.
there could be no charge; and so it was held. See *Belton* v. *Williams*, 2 Ves. Jr. 138; *Jones* v. *Harris*, 9 Ves. Jr. 486. But the still later cases have in terms or effect repudiated the fiction and with it the distinction between written engagements of a *feme covert* and her general liability for money advanced, services rendered, or goods sold."

He then procceeds to show, that such are the recent decisions in England, referring to *Owens* v. *Dickenson*, 1 Cr. & Ph. 48, and *Murray* v. *Barlee*, 4 Sim. 48, and then adds : "The principle in short, which now governs in cases of this kind, is that a wife's separate estate is liable to pay her debts during coverture, in whatever from they are incurred, not because her contracts have any validity at law, nor by way of appointment or charge, but because equity decrees it to be just, that they should be paid out of such estate. Of course it is not to be denied, that a wife may appoint, or specifically appropriate, her separate estate to the payment of her own or her husband's debts. She may, if she pleases, even give it to her husband. What I am denying is, that the contracting of a debt is of itself an appointment or charge."

This is a clear and distinct announcement of the true principle as deduced from the English cases, which is, that a wife's separate estate is liable to the payment of all her debts however contracted, whether by parol or in writing, not because she has charged them on her separate estate, or because there is any evidence, that she has done anything evincing an intention to make it a charge, but simply because it is her debt, and her property should be liable for its payment; liability to the payment of all debts being an incident to the ownership of property. These clear views have however unfortunately not been followed by the New York courts. The reason for their departure from them will be presently shown.

Judge Comstock expressly condemns the remarks of Chief Justice Jewett, in *Vanderheyden* v. *Mallory*, 1 Com. 452, which he says was *obiter* merely; but he argued, that as the bond of a *feme covert*, which she

signs merely as the surety of her husband, was void at law, that on the principle that if a man executed a bond simply as surety, and for any reason it was not binding on him at law, a court of equity would not hold him liable, such court never holding a *surety* equitably liable, who had been technically discharged at law, this principle he thought applicable to a married woman who was surety in a bond. And not being bound in law he held, that her separate estate in such a case could not be held bound in equity. He admitted, that his views on this point were opposed by the decisions in *Starford* v. *Marshall*, 2 Atk. 69, and *Heatley* v. *Thomas*, 15 Ves. 596; but he regarded these cases as decided without sufficient consideration.

I submit, that the true doctrine is, that if she enters into a suretyship for a sufficient consideration, as an advance of money to her principal, it would be, were she a *feme sole*, her own debt; and according to the reasoning of Judge Comstock, her separate estate should be held liable for such a debt, as it would be for any of her other debts. But if she went surety for her husband, or any one else, by signing a note as surety for a just debt of her husband, or such third person, and no new consideration existed for such debt, such as extension of the time of payment, such surety debt could not be charged on her separate estate, simply because, if she had been a *feme sole*, such note could not have been enforced against her: the contract of suretyship being in such case *nudum pactum*. And though she had sealed as well as signed such note, it could not have been enforced against her separate estate, because, though she would have been bound at law as a *feme sole* by her having sealed the note, yet this would be, only because she would be estopped from showing, that it was a *nudum pactum*. As her bond as a married woman is void at law, such estoppel could not be relied on in equity; and her separate estate ought not in such case of suretyship to be held bound in equity.

This I understand was the ground of the decision. But while I differ ·with Judge Comstock in his conclusion on this one point, I consider, that he has announced in this opinion the true principles of the law in other respects, as settled by the English decisions, with great force and clearness.

Judge Harris was the only other judge, who delivered an opinion in this case of *Yale* v. *Dederer.* He too bases his opinion on the ground, that it was a *surety* debt, and not one incurred for her own benefit; and while his opinion is not very clearly expressed, I think it may be inferred, that he would have held the wife's estate bound for any debts, whether in writing or not, which she incurred for her own benefit; though he does say, that she must either make the debt an express charge on her separate estate, or, where she has not in making the contract referred to her separate estate, or expressed her intention to satisfy it out of her separate estate, the circumstances of the case must be such as to leave no reasonable doubt, that such was her *intention.* He cites however approvingly the opinion of Cowen, J., in *Gardner* v. *Gardner,* in which he says: " The separate debts, contracted by her *expressly on her own account,* should in all cases be considered an appointment or appropriation for the benefit of the creditor, as to so much of the separate estate as ·is sufficient to pay the debt, if she be not disabled to charge it by the terms of the donation." He refers also to the cases of *Colvin* v. *Currier,* 22 Barb. 371 ; *Curtis* v. *Engle,* 2 Sandf. Ch. 287 ; *Dickerman* v. *Abrahams,* 21 Barb. 551 ; *Goodall* v. *McAdams et ux.,* 74 How. (N. Y.) Pr. 385, *The North American Coal Co.* v. *Dyett,* 7 Paige 9 & 20 Wend. 570, as sustaining his views.

But he goes further and says : " Indeed there is much to recommend the practice, which has been adopted in some of the States, of looking into the circumstances of the case sufficiently to see, that the wife will suffer no injustice, before allowing a charge upon her separate estate to be enforced. *Magwood* v. *Johnson,* 1 Hill's Ch.

228. In this case it was held, that a court would

enquire into the propriety of an express charge, and not allow the wife to charge her estate by her own mere act and will without evidence, that it was necessary, or at least proper."

Such a rule, it seems to me, would leave the whole question, whether a particular debt should be charged on her separate estate, to the arbitary discretion of the judges who happened to constitute the court.

The court in the case of *Yale* v. *Dederer* reversed the judgment of the Supreme Court, granted a new trial and remanded the cause. The only additional fact appearing on the second trial was, that it was proved by parol, that Mrs. Dederer, when she signed the note as surety for her husband, intended to charge her separate estate with the payment of the debt; and on this judgment was again rendered against her. The case was taken by appeal to the Supreme Court; and in 1860 it was again approved by the Supreme Court, (see 31 Barbour 625,) they holding, that as it now appeared that she intended, when she signed this note as surety of her husband, to charge her separate estate with its payment, and that even under the opinion of Judge Harris in the case of *Yale* v. *Dederer*, 18 N. Y. 283, her separate estate was bound. An appeal from this decision was taken to the Court of Appeals, and again reversed: Judges Comstock, Denio and Bacon being of the opinion, that the case as now presented did not vary from that, when formerly before the court, the parol evidence being regarded as inadmissible to explain the note. But a majority of the court based their opinion on entirely different grounds, and held, that "the intention to charge the separate estate must be stated in the contract itself, or the consideration must be one going to the *direct benefit of the estate.*"

The only opinion delivered was by Judge Selden. See *Yale* v. *Dederer*, 22 N. Y. 451. He says: "If the instrument, by which the estate was created, conferred upon the wife either a general or qualified power of dis-

position, no one ever questioned her right to execute the power; the doubts, which arose, related to her right to dispose of, or charge, the property independently of such special authority; and this right was established soon after the introduction of such estates, upon the ground that the right of disposal was a necessary incident to the right of property.

"*That this universal jus disponendi was the sole and only foundation of the right in question is clear. Lord Thurlow in the case of Fettiplace v. Gorges, 3 Bro. C. C. 8 places the right upon this ground; and no other basis has ever been suggested for it.* Assuming then this to be the foundation of the right, it is plain, that the wife, to avail herself of it, must make some disposition of the specific property itself. It is clearly impossible to deduce from the *jus disponendi*, which accompanies all rights of property, power to make any contracts, except such as related directly to the property, to which the right of disposition is attached; and yet the Master of the Rolls, in *Norton* v. *Turville*, 2 P. Wms. 144, and in *Stanford* v. *Marshall*, 2 Atk. 69, held the separate estate of a married woman liable for the payment of her bond, although the bond in no manner referred to such separate estate, and in the latter case was given for money lent her husband.

"The reasoning, upon which these cases are said to have proceeded, and upon which they are followed by Lord Thurlow, was this: that it being the rule in equity, that a wife, who had a separate estate, might deal with such separate estate in the same manner as if she were *sole*, it followed, that such estate was liable for her engagements in the same manner, as it would be, if she were a *feme sole*. *This equitable rule, which being founded entirely on the right* of *the wife to dispose of her property*, could go no further than to allow her to make contracts specifically appropriating, or charging her separate estate, was thus expounded so as to enable her to contract generally without in any manner referring to such estate. The doctrine was justly characterized by Chancellor Kent in the case of the

1879
Special Term.
———
Radford *et al.*
v.
Carwile *et al.*

*Methodist Espiscopal Church* v. *Jaques*, 3 Johns Ch. 77, where speaking of the two cases, to which I have referred, among other things he says: 'It is difficult to perceive, upon what reasoning or doctrine the bond, or parol promise, of a *feme covert* could for a moment be deemed valid. She is incapable of contracting according to the 'common right' mentioned by Lord Macclesfield; and if investing her with separate property gives her the capacity of a *feme sole,* it is only when she is directly dealing with that very property. The cases do not pretend to give her any of the rights of a *feme sole* in any other view, for any other purpose.' "

It will be seen, that all this reasoning of Judge Selden is based on the assumption, that the liability of a married woman's separate estate is based solely on her right of disposing of her separate property at her pleasure. This fully appears from the portions of his opinion, which I have italicised. He says, that the liability of her separate estate was placed by Lord Thurlow in the case of *Fetti-place* v. *Gorges,* solely on this ground; and he adds: "No other basis has ever been suggested for it." This is a palpable error of Judge Selden, and a most singular assumption. Though the case of *Fettiplace* v. *Gorges,* 3 Bro. C. C. 8; 1 Ves., Jr., 46, was not one, in which it was sought to charge a married woman's estate with a debt, and the only question involved was her right to bequeath her personal estate, and of course we had no right to anticipate any expression of opinion on the question of the grounds, on which her separate estate was held liable for her debts; yet the Chancellor, as if to prevent the possibility of any one falling into such an error, as Judge Selden seems to have fallen into, takes care to say: "all the cases show, that the personal property, when it can be enjoyed separately, must be so *with all its incidents*, and the *jus disponendi* is *one of them.*" Is it not clear that the Chancellor from this was bound to hold, that the wife's separate estate was liable for *all* her debts, whenever the question arose? He says, she must enjoy it

with *all its incidents* as property ; and no one can dispute, that liability to the payment of all debts is as much an incident of the ownership of property as the *jus disponendi*. And to make his meaning still clearer, he significantly adds : " The *jus disponendi* is *one* of these incidents." And accordingly in all cases, which came before him for decision, Lord Thurlow held, that a wife's separate estate was liable for the payment of her debts. The statement of Judge Selden, that the liability of the estate of a married woman was based solely on her *jus disponendi*, "and no other basis has ever been suggested for it," is even more strange than his misconception of Lord Thurlow's views in *Fettiplace* v. *Gorges.* The truth is, for a long series of years after it was firmly established by numerous decisions, that a married woman's separate estate was liable for certain of her debts, there was no suggestion, that the basis of this liability was her *jus disponendi*, or that it was only liable because she had charged her separate estate with it. . This liability was enforced over and over again, when there was no allegation, that she had made any charge of it on her separate estate ; and not the slightest allusion is made to her charging her estate as the basis of its liability ; but on the contrary they were evidently charged on her separate estate, because liability to their payment was an incident to her ownership of the separate estate. This we have shown, was clearly the doctrine of all the old English cases.

Judge Story in his work on Equity, volume 2, section 1401 shows, that the old English cases do not put the liability of a married woman's separate estate to the payment of her debts on the ground, that she had charged a particular debt on her separate estate, that is, on her *jus disponendi*. He says : " In the earlier English cases the doctrine was put on the intelligible grounds, that a married woman is as to her separate property to be deemed a *feme sole* ; and therefore that her personal engagements, though they would not bind her person,

should bind her separate property." And to sustain this
proposition he refers to *Hulme* v. *Tenant*, 1 Bro. C. C. 8,
(Mr Bell's note); *Peacock* v. *Monk*, 2 Ves. 193; *Norton*
v. *Turvill*, 2 P. Wms. 144; *Lillia* v. *Airey*, 1 Ves. Jr.
277; Mansfield, C. J., in *Morse* v. *Craig*, 5 Bos. & Pul.
162; *Angel* v. *Hadden*, 2 Meriv. 163.

Judge Selden is even more unfortunate in referring to
the case of *Norton* v. *Turvill*, 2 P. Wms. 144, than he
was in his reference to that of *Fettiplace* v. *Gorges*, 3 Bro.
C. C. 8; for so far from countenancing his notion, that
no other basis for holding the separate estate of a mar-
ried woman liable for her debts, except her having
charged her separate estate with it under *jus disponendi*
had ever been suggested, *Norton* v. *Turvill*, 2 P. Wms.
144 put the liability of her separate estate on the
broad ground, that it is liable as a matter of course, to
the payment of all her debts, the trust creating her sep-
arate estate being a trust also for the payment of all her
debts. The Master of the Rolls as the basis of his
judgment, says : " It is true, that the bond given by the
married woman was merely void, and in that respect
differs from a bond given by an infant, which is merely
voidable; but in this case all the separate estate of the
married woman was a trust estate for the payment of
debts;" and therefore he held it liable. Surely this was
not basing the liability of her separate estate on her *jus
disponendi*.

Of course it was easy to show, that this decision was
utterly inconsistent with the assumption, that the only
basis, on which any debt could be charged on the estate
of a married woman, was that she had, under her *jus
disponendi*, charged the estate with a particular debt;
but it does not follow, that the decision was erroneous;
it only shows, that the assumption, that the only ground
for the holding of her estate liable was based on her *jus
disponendi*, is utterly unfounded. I do not say, that this
has not been suggested as the only ground for this lia-
bility. Some of the old cases may have suggested this
as one ground; but I say, that the old English cases were

decided generally on the broad ground, that her separate estate was liable to all her debts as an incident to the ownership of the property, and without any reference to her having charged a particular debt on her separate estate; and though there did follow a number of cases, in which it was suggested, that the basis of the liability of a married woman's separate estate, was her so charging it expressly, or impliedly, under her *jus disponendi*: yet the modern English cases have substantially repudiated this novel ground as the basis of this liability, and have in principle, though not always in express words put it upon the old and intelligible ground, that her separate estate was liable to the payment of all her debts, that being an incident to her ownership of the property. This position, I think, I have clearly shown is sustained by the earliest as well as most recent English cases.

The allegation of Judge Selden, that the wife's right to charge her separate estate with a debt under her *jus disponendi* was the only basis, on which this liability had ever been suggested to be founded, is still more remarkable, when we consider, that when he announced this strange proposition, Chief Justice Comstock was on the bench, and he had in this very case, when formerly before the court, not only suggested another basis for this liability, but had shown in a forcible opinion, that this liability for the payment of debts by the separate estate of a married woman was in no manner based on her *jus disponendi*, but was entirely independent of it, and that it was immaterial, whether she had charged the debt on her separate estate under her *jus disponendi*, or not, and without such charge, if it was her debt, her separate estate was in all cases liable for its payment, as an incident to her ownership of the property. His conclusion was : " The principle in short, which now governs in cases of this kind, is that a wife's separate estate is liable to pay her debts during coverture, in whatever form they are incurred, not because her contracts have any validity at law, *nor by way of appoint-*

1879
Special Term.
—————
Radford et al.
v.
Carwile et al.

*ment or charges,* but because equity decrees it to be just, that they should be paid out of such estate."

If I can understand language, this was certainly a different basis of liability from that assumed by Judge Selden to be universally admitted as the only basis of this liability.

The whole reasoning of Judge Selden throughout his opinion is based on these false premises, and is therefore unsound and fallacious. The opinion of Chancellor Kent referred to by Judge Selden was overruled, as we have seen, by the Court of Appeals of New York, and though the particular part of the opinion of the Chancellor, which is quoted, was not commented on in the Court of Appeals, this can easily be accounted for, when we advert to the fact, that in that case the question raised was not as to the liability of a married woman's separate estate for her debts. . Besides this false assumption of premises Judge Selden's opinion is liable in other respects to criticism; but I shall not further criticise it, but will content myself with some quotations from an able review of this opinion by Chief Justice Dixon in *Todd* v. *Lee et al.,* 15 Wis. 371.

In speaking of this case he says : "I would gladly have avoided all comment on this case. My patience has been so tried in considering it, that I fear I cannot give it an impartial examination—that I may deal unjustly by a learned judge, whose candor and ability have uniformly commanded my highest respect. I feel, that he has done himself great injustice—that he has given way to a spirit of disingenuousness and cavil, which seem everywhere to pervade the opinion. * * * * Had he not perverted the decisions, unintentionally perhaps, to suit his own purposes, and placed the courts in attitudes they never chose to occupy, the task would have been less laborious and far more pleasing.

"His position in short is this: A married woman possessed of separate property under the statute, cannot bind her separate estate in equity for the payment of any debt con-

78

tracted by her, unless it be a debt incurred for the direct benefit of the estate itself, without the formal execution of an instrument *specifically appropriating, or disposing of,* the estate to that purpose in such manner as to subject it to actual charge or lien. The *jus disponendi* is not denied. She may charge her estate with the payment of her own debts, or those of another ; but to do so in either case, she must execute some agreement, or perform some act, which at least would amount to a mortgage or pledge, if she were a *feme sole.* It will be seen at once, that the learned judge sticks in the bark, that it is to be a revolution without cause or reason, inaugurated to effect a change in mere matters of form. No additional guards are to be thrown around her estate ; no new indemnity gained ; but a ceremony is to be observed not before deemed necessary. To accomplish this, she must be deprived of one of the principal advantages arising from the ownership of property in all commercial countries : the privilege of obtaining, if need be, a general credit on the faith of that property.

"To prove that this is, or ought to be, the law, the learned judge begins by asserting, that the 'universal *jus disponendi* was the sole or only foundation of the right in question, and that no other basis has ever been suggested for it.' So untrue is this in point of fact, that the cases, where it has been sustained as an exercise of the disposing power, are so few as to scarcely constitute an exception to the great number, in which it has been placed on an entirely different ground, namely, that a married woman possessed of a separate estate is, as to all matters pertaining to such estate, except as she is expressly limited by the instrument creating it, to be regarded in equity as a *feme sole,* and may charge or affect it by any act or contract, which would be binding at law, if she were unmarried. Not that she can bind herself personally, nor that the engagement is an execution of her power to dispose of the property and constitutes a lien upon it; but that it is one of the inherent qualities of the

1879
Special Term.

Radford et al.
v.
Carwile et al.

estate itself—an incident annexed to it as common to property in general, and necessary to its full enjoyment —that the owner may contract debts to be paid out of it, for which equity, in default of process at law, will under proper circumstances give execution, in case payment is not made. This is the doctrine of both the earlier and later English decisions; and it is only in a few cases, not much discussed, before Lord Loughborough and Sir John Leach, Vice Chancellor, that it is spoken of as an appointment, or execution of a power. It was also the doctrine of the courts of New York, as will be seen by the quotations already made."

He then reviews the English cases, and shows, that they sustain this position, and expresses his surprise, that Judge Selden should refer to the case of *Fettiplace* v. *Gorges*, and *Norton* v. *Turvill*, and *Stanford* v. *Marshall*, and also to show, that Chancellor Kent is made to contribute too strongly to the judgment in *Yale* v. *Dederer*. He then proceeds to comment on Judge Selden's opinion, in which he alleges, that Lord Cottenham in *Owens* v. *Dickenson*, 1 Cr. & Ph. 48, inaugurated an entirely new doctrine : "that equity lays hold of the separate property, and appropriates it to the payment of the debt, not on account of anything contained in the contract ; not because the wife by any agreement, expressed or implied, has made the debt a charge ; but because she has the power incident to property in general, namely: the power of contracting debts to be paid out of it;" and on that portion of Judge Selden's opinion, in which he says, that these views of Lord Cottenham are irreconcilable with the views expressed by Lord Brougham in *Murray* v. *Barlee*, 4 Sim. 48. His comments are striking.

On this portion of Judge Selden's opinion Chief Justice Dixon says : "We fail utterly to perceive the alleged discrepancies in the reasoning of Lord Brougham and Lord Cottenham. Their views seem to us to be in harmony, and stand well together. They reach the same

conclusion by slightly different, but not inconsistent, modes. After noticing that the existence of the wife is merged in the husband at law, Lord Brougham says: 'But in equity the case is wholly different. Her separate existence, both as regards her liabilities and rights, is here abundantly acknowledged; not indeed that her person can be made liable, but her property may; and it may be reached through a suit instituted against herself and her trustee.' Lord Cottenham says: 'According to that view (*Hulme* v. *Tenant*) the separate property of a married woman being a creature of equity, that if she has a power to deal with it, she has the other power incident to property in general, namely: the power of contracting debts to be paid out of it; and inasmuch as her creditors have not the means at law of compelling payment of those debts, a court of equity takes upon itself to give effect to them, not as personal liabilities, but by laying hold of the separate property as the only means, by which they can be satisfied. These views are not inconsistent." I will add, that the views of Lord Cottenham are, I understand, the same in substance as those expressed by Lord Thurlow, in *Hulme* v. *Tenant,* 1 Bro. C. C. 16.

In another part of his opinion Chief Justice Dixon, p. 375, says, that in *Hulme* v. *Tenant,* Lord Thurlow, entertained these views and expressed them clearly, quoting his language as follows: " I have no doubt about the principle, that if a court of equity says a *feme covert* may have a separate estate, the court will bind her to the whole extent, as to making that estate liable for her own engagements, as for instance, for the payment of debts, &c." He further says, that the only question in his mind was, how it was to be enforced out of her separate estate by the sale of it, or by an application of the rents and profits to the payment of her debt. And that in this connection Lord Thurlow says: "The question is, what sort of an execution this court will award against her separate estate." Chief Justice Dixon says, that the language of Lord

1879
Special Term.

Radford et al.
v.
Carwile et al

Thurlow, used by him in the discussion of this question, is quoted by Judge Selden, as applicable to the question at large, and Judge Dixon says: "if this be not perversion of authority, I am a loss to know what it is."

As this is strong language for a judge to use, I will quote what Judge Seldon does say, and compare it with what Lord Thurlow said. Judge Selden says in 22 New York R. pp. 453, 454: "But though Lord Thurlow followed, as we have said, what he. supposed to be the rule established by the cases referred to, he nevertheless saw the fallacy, on which those cases were based, as appears by his remarks in *Hulme* v. *Tenant*, 1 Bro. C. C. 16, the leading case on this subject. There the separate estate of a wife was held liable for a bond given for money borrowed, part of which had been borrowed by her husband. After referring to the previous cases Lord Thurlow says : 'I take it therefore to be impossible to say, but that a *feme covert* is competent to act as a *feme sole* with respect to her separate property, when settled to her separate use ; but the question here goes a little beyond that ; it is not only how far she may act upon her separate property : I have no doubt about that ; but the question is how far her *general personal engagements*, shall be executed out of her separate property ; still, although thus clearly seeing the distinction, which ought, as it would seem, to have been decisive against the claim, he nevertheless yields to the authority of previous cases, and holds the separate estate liable."

I will now give the full quotation from Lord Thurlow's opinion in *Hulme* v. *Tenant*. He says : "I take it therefore to be impossible to say, but that a *feme covert* is competent to act as a *feme sole* with respect to her separate property, where settled to her separate use. But the question here goes a little beyond that ; it is not only how far she may act on her separate property : I have no doubt about that ; but the question is, how far her general personal engagements shall be executed out of her separate property. If she had by instrument

contracted, that this or that portion of her separate estate should be disposed of in this or that way, I think she and her trustees might have been decreed to make that disposition ; but if she enters into an engagment, which would make a *feme sole* liable to the whole extent of the contract as to her person, &c., in every respect, it is clear such general engagement entered into by a *feme covert* will not bind her as such. It is not like the case of an infant, who is incapable of acting ; but in respect to a *feme covert* determined cases seem to go thus far : that the general engagement of the wife shall operate on her personal property, shall apply to the rents and profits of her real estate, and that her trustees shall be obliged to apply personal estate, and rents and profits, when they arise, to the satisfaction of such general engagement ; but this Court has not used any direct process against the separate estate of the wife, and the manner of coming at the separate property of the wife, has been by decree to bind the trustees, as to personal estate in their hands, or rents and profits, according to the exigencies of justice or the engagement of the wife, to be carried into execution. I know of no case which goes further than that. Suppose the wife to have power by settlement, to dispose of the real estate to any uses she shall think fit, yet the trustees must make the formal instrument, without which the estate cannot pass. I know of no case, where the general engagement of the wife has been carried to the extent of decreeing, that the trustees of her real estate shall make conveyance of the real estate, and by sale, mortgage or otherwise, raise the money to satisfy that general engagement on the part of the wife." Lord Thurlow subsequently in the same case said : "I have no doubt about this principle, that if a court of equity says a *feme covert* may have a separate estate, the court will bind her to the full extent as to making that estate liable to her own engagements: as for instance, for the payment of debts, &c."

There cannot upon these clearly expressed views in

my mind be the least question, that Lord Thurlow re-
garded the separate estate of a married woman liable to
all her debts; nor did he have any question, but that her
separate estate was as liable for the payment of general
debts and engagements, as those which she had specifi-
cally charged on a portion of her separate estate. The
only question, which he entertained any doubt about,
was, whether her general engagements and debts could
be executed out of her real estate by ordering the trus-
tees to sell or mortgage it. This the court could do, if
she had specifically agreed, that a portion of her real es-
tate might be sold to pay a particular debt; but if not
thus specifically charged, he concluded that a general
debt could be executed only by the sale of her personal
estate and out of the rents and profits of her real estate.
The only difference, he recognized as having any exis-
tence between her general engagements and specific
charges, was in the mode of executing or enforcing them
out of her real estate.

It is obvious, that the quotation in Judge Selden's
opinion from Lord Thurlow, disconnected as it was from
what preceeded and succeeded it, was calculated to mis-
lead the reader as to Lord Thurlow's views; and the
conclusion of Judge Selden, that he perceived a differ-
ence as to the liability of a married woman's estate be-
tween her general engagements and those charged by
her on her estate, is clearly wrong. The only difference,
Lord Thurlow perceived between these, was in the mode,
in which they were to be executed, or satisfied, out of
her separate estate. In the quotation, Judge Selden
made from Lord Thurlow, instead of italicising the
words "general personal engagements," as he did, he
should have italicised the words "shall be executed out
of her separate property." I would not use the strong
language of Chief Justice Dixon, that this was a per-
version of authority; but I would say, it was an entire
misapprehension by Judge Selden of its meaning. And
I might well say, the same or as great a misapprehension

1879
Special Term.

Radford et al.
v.
Carwile et al.

exists as to the meaning of various other authorities, he cites in this opinion; but I have dwelt upon it too long already.

Chief Justice Dixon further says: "We do think, that we can see and appreciate great inconsistencies in the reasoning of Judge Selden. And as instances of it he points out the denial of the judge, that parol evidence could be received, as he says, to explain or qualify the contract so as to charge the separate estate, and insists, that the contract itself on its face must make the charge; and yet he admits, that every debt incurred for the direct benefit of the estate is binding on the estate, as Judge Selden says: 'If contracted for the direct benefit of the estate itself, it would of course become a lien, upon a well founded presumption, that the parties so intended, and in analogy to the doctrine of equitable mortgages.' This," says Judge Dixon, "is pushing analogy beyond all reason. If a married woman buys a team for the use of her farm, the debt incurred becomes by this view an equitable mortgage on the farm, as if it were a part of the purchase money of the farm. There is no analogy; and hence Judge Selden falls back on the presumed intention to make a charge; a doctrine, which throughout his opinion he had argued, was fallacious. This intention he had shown could not be made to stand for the contract to charge, which was essential. And then how can the court learn, whether a contract, or note, was given for the benefit of the separate estate, except by receiving parol evidence? How except by parol evidence could it appear in that case, that this note signed by Mrs. Dederer and her husband was her note, given for the direct benefit of her separate estate, and her husband was only surety, if such was the fact? yet if this had been the fact, her estate would have been held liable. The parol evidence must be received in such case, before, on the rules laid down by Judge Selden, it is possible to decide, whether her estate is, or is not, liable; and yet he would according to his views have to

exclude such evidence. The parol evidence ought to have been received in this case in equity, where parol evidence is received, where two have signed paper commercial, and otherwise to show the nature of the transaction and to change and modify apparent rights and liabilities. I would add, that when this case came a third time before the court, parol evidence was admitted on the question, whether the bond signed by Mrs. Dederer and husband was, or was not, given for the benefit of her separate estate. See 68 N. Y. R. p. 329."

Upon the whole I must say, that these criticisms of Judge Dixon on this opinion are substantially sound in my opinion, though the language he has used is rather unjudicial in its character, and some of his inferences are not just.

The case of *Yale* v. *Dederer*, was reversed the second time, and remanded for a new trial in 1860. See 22 N. Y. 461. On this third trial an effort was made to prove that the debt sued on was contracted by Mrs. Dederer, for the benefit of her separate estate; and the evidence seemed to establish, that a portion of it was for the benefit of her estate, but the Supreme Court held otherwise and rendered a judgment against the plaintiff; and it was a third time by appeal brought in 1878. (See 68 N. Y. 329) before the Court of Appeals of New York, who being of opinion that upon the record as presented to them, the debt could not be regarded as contracted for the benefit of Mrs. Dederer's separate estate, held, "that the rule, that in order to charge the estate of a married woman with a debt not contracted for the benefit of her separate estate, the intent to charge such estate with the obligation must be expressed in the instrument, is *res adjudicata* in this case (22 N. Y. 450), and having been established as the law of the State will not be departed from."

The only opinion delivered was by Church, Chief Justice, who having reached this conclusion, adds: "In the case of *Manhattan B. & M. Company* v. *Thompson*, 58

N. Y. 80, in delivering the opinion of the court, I intimated a regret, that the rule had not been established differently, so that since married women are allowed by the statute to take, hold, manage and dispose of property as fully and completely as if they were unmarried, the signing of a note or other obligation should be deemed a sufficient evidence of an intention to charge their separate estates; and further reflection and examination has confirmed the impression then expressed; but I then thought the rule had been too long established as the law of the State to justify the court in overruling it; and I am still of that opinion. There is every reason for referring the question to the legislative power to determine definitely what rule shall finally prevail." As the other judges rendered no opinion, I presume they entertained the same views.

In the case referred to by the Chief Justice, his opinion, of how the law ought to have been settled, goes further than in this last opinion. In that opinion (see 58 N. Y. 84,) he says: "If when the Legislature changed the common law in essential particulars, in regarding the interest in property of the husband and wife to a considerable extent as distinct and independent, and in recognizing the capacity of the wife to judge and provide, what her own welfare requires in acquiring and holding the legal title to property, and managing and disposing of the same, as if unmarried and without subjection to the control of her husband, the courts had adopted, as a reasonable and legitimate sequence, the correlative rule of a capacity to contract debts, as if unmarried, restricted only to their collection from separate property, it might well be claimed, that the rights of married women would have been as well, if not better protected practically, and business morality more promoted, and a flood of expensive and vexatious litigation prevented.

" Courts of equity in England have uniformly exercised a power of enforcing contracts of married women against their separate estate, which has practically pro-

duced this result, 2 P. Wms. 144; 1 Cr. & Ph. 48. But our courts have adopted more conservative principles; and it is better to adhere to them, until the legislature in its wisdom and power shall see fit to change them."

I understand the Chief Justice to regret, that the English rule, whereby a married woman's separate estate is made liable for all her debts, as if she were unmarried, had not been adopted; and as saying, that the abandonment of this English rule has been practically found in that State to be, not only contrary to sound public policy and injurious to business morality, but also of no practical benefit in protecting the property of married women. And I further understand him frankly to admit, what was strenuously denied in 1860, when *Yale* v. *Dederer*, was decided, that the courts of equity in England have always exercised a power of enforcing contracts of married women, which practically amounted to subjecting their separate estate to the payment of all their debts, however contracted. These admissions are important as a warning to us; and a review of the New York cases since the decision in *Yale* v. *Dederer*, in 1860 will, I think, clearly show, that the only effect of that decision has been "to produce a flood of expensive and vexatious litigation;" that it has failed practically to better protect the property of married women; and has been prejudicial to sound public policy and business morality. The very case, in which these views are expressed, is a strong illustration of all these views of the Chief Justice.

In that case a married woman in writing authorized her husband to contract with plaintiff for her, and in her name, for certain articles, and said in the writing, that the plaintiff might hold her responsible for any contract made therefor with the plaintiff. The articles were accordingly bought and used in his business by the husband; but as she did not expressly charge her separate estate with the payment of the debt, it was decided by a

divided court, four to three, that her separate estate was not liable for the payment of the debt; Chief Justice Church concurring with the majority. He was of the opinion, that under the law as laid down in *Yale* v. *Dederer*, 22 N. Y. 456, her estate could not be made liable; though he well. says : "the facts present a strong case of moral liability against the defendant for the payment of the debt." Many other cases, in which equally gross injustice has [resulted from this rule, have been presented by the New York decisions. Thus in *White* v. *McNutt*, 33 N. Y. 371, the husband and wife transferred a mortgage owned by the wife, with a guarantee of collection signed by both husband and wife, and because the consideration of the transfer was paid to the husband, and was not in fact applied to the benefit of her separate estate, though the bond transferred belonged to the wife, yet a majority of the court held her separate estate was not bound by her guarantee.

In *Weir* v. *Groat*, 4 Hun. (N. Y.)193, a merchant refused longer to trust a husband for groceries and provisions ; his wife, who had a separate estate, then agreed, that she would be responsible for the groceries thereafter furnished, saying that she had separate property ; and a memorandum book was furnished her, and she charged in it the groceries furnished; she afterwards promised to pay this debt. The court admitted, that she could by a verbal contract made on a good consideration, as in this case, charge her separate estate by simply expressing such intention ; but as she had not expressed such intention, her separate estate was not liable in this case. The court say : " in order to charge her estate, she must express such intention in her contract. This she has not done. The respondent labors under the false idea, that such intention may be inferred from her simple promise to pay. That would destroy the only distinction now remaining between the contracts of a married and unmarried female."

This case seems irreconcilable in principle with *Con-*

*lin* v. *Cantrell*, 64 N. Y. 217, where the court decided: "that in order to charge a separate estate of a married woman with a debt, it is not necessary, that there be a specific agreement to that effect. The intent may be inferred from the surrounding circumstances." In that case a seamstress did work for a married woman and her children, she not living with her husband. She told the seamstress, she had separate property, but did not say she would pay for her work out of it, but promised to pay her after the work was done. It was held, that her separate estate was liable. If the true principle, on which the New York courts act, as stated in this case, be that "the intent to charge the separate estate need not be expressed, but may be inferred from surrounding circumstances, I cannot see, how it was possible to refuse to draw this inference in the case of *Weir* v. *Groat*, 4 Hun. 193.

The trouble with the court in that case was evidently, that if they did not require this intent to be expressed in the contract, and permitted it to be drawn from surrounding circumstances, they would break down entirely the distinction attempted to be made between general debts and debts charged by a married women on her separate estate. And indeed it is difficult, if not impossible, to perceive, how any circumstances can prove this intention more clearly than the simple fact, that a married woman having separate estate contracts a debt and promises to pay. It is impossible to conceive, what such contracting of a debt and promise to pay it can mean, except that she will pay it out of her separate estate. This is the only possible way, in which she can be made to pay it; and if she does not by such promise mean to pay it in this manner, it must be, that knowing this nice point of law she intends to mislead and defraud. If she makes this promise to pay in writing, the English courts, who when for a time they acted on this false idea, that a charge of her separate estate was necessary, inferred, that her intention was to charge her

1879
Special Term.

Radford et al.
v.
Carwile et al.

separate estate simply from her promise to pay the debt; but this inference the court in *Yale* v. *Dederer*, 22 N. Y. 456, refused to draw and yet in *Conlin* v. *Cantrell*, 64 N. Y. 217, we find the court drawing this inference of an intent to charge from a verbal promise to pay and surrounding circumstances. The inference then, drawn from surrounding circumstances in the case of a parol contract, cannot be just, when the courts refuse to draw this inference from her solemn promise in writing to pay a debt: a promise entirely unmeaning, if it does not mean, that she will pay out of her separate estate. And surely, if the surrounding circumstances are to be considered, the court ought in *The Manhattan B. & M. Co.* v. *Thompson*, 58 N. Y. 80, to have held the married woman's estate liable for the debt. Her purpose in making the contract, as shown by the surrounding circumstances, was unquestionably to make her separate estate liable; and if it had been a verbal contract, which she had made, I presume the court would have held her separate estate liable under the circumstances; but as the contract was reduced to writing, they refused to do so.

When reduced to writing, the New York courts appear to proceed on the idea, that there must be an express charge on the separate estate made by the contract, or it cannot be made liable under any circumstances, except when it is for the direct benefit of the estate. But the identical same contract, if not reduced to writing, they would under the same circumstances hold, makes the separate estate liable. The reduction to writing of the contract, intended obviously to render more certain the payment of the debt, is thus made a reason for defeating its payment. This difficulty (I would almost say absurdity) was caused by the language used by Judge Seldon in delivering the opinion of the court in *Yale* v. *Dederer*, 22 N. Y. 456, where he says: "Lord Brougham says, that though originally the courts supposed, that to affect the separate estate there must be some real charge, as a mortgage, or an instrument amounting to the execution

of a power, afterwards the 'intention of the wife was more regarded; and the court only required to be satisfied, that she *intended* to deal with her separate property. The intention here spoken of is not an intention, which is proven by extraneous evidence *dehors* the contract, but an intention, which is to be inferred from, and is therefore embraced in, or manifested by, the contract itself. No court has ever held or intimated, that parol evidence was admissible to prove, that the bond or note of a *feme covert* was intended to be a charge upon her estate."

I would simply say, that before the English courts abandoned the idea of any charge expressed or implied being necessary, they uniformly held, that if such charge were necessary, it was necessarily implied from the mere giving of the bond or note; for when she gave her bond or note, it must be presumed, that she intended it to have some effect; and as it is void at law, and can have no effect, unless it is a charge on her separate estate, it follows, that she must intend it to be such charge. These being the decisions and this the reasoning of the courts, of course there was no necessity to prove the surrounding circumstances, as showing her intent; and no evidence of it was ever offered. Had it been necessary to show their intent and had it been offered, I doubt not it would have been received by the English courts, as it might properly have been according to the general rules of law in such cases.

In *Maxon* v. *Scott*, 55 N. Y. 247, it was held, that a married woman's separate estate was bound for the payment of the board of herself and husband, which she engaged, and verbally promised to pay, and charged her separate estate with it. When this case is compared with *Weir* v. *Groat*, 4 Hun. 194, it seems that in New York, if a married woman, having a separate estate, buy necessaries for the family, and promises to pay for them and has them charged to herself, her separate estate is not liable; but if the clerks in the store prove, that she

1879
Special Term.
————
Radford *et al.*
v.
Carwile *et al.*

promised to pay for them out of her separate estate, then her estate would be responsible, though no one can see or understand the difference between promising to pay for them and having them charged to herself, and promising to pay for them out of her estate; and what is still worse, if the merchant, after she has promised to pay for them out of her estate, and is thus responsible, should in his ignorance take from her a note, in which she promised to pay the amount, but said nothing about her separate estate, he would thereby, according to *Yale* v. *Dederer*, 22 N. Y. 456, release her estate from its payment.

Well may Chief Justice Church say in *Manhattan B. & M. Co.* v. *Thompson*, 58 N. Y. 85, while following their decisions as authority: "the rights of married women would have been as well, if not better protected practically, sound public policy and business morality more promoted, and a flood of expensive and vexatious litigation prevented," had the English rule of holding her separate property liable for all her debts been adopted.

At one time it was decided in New York, it is true, in *Kelso* v. *Tabor*, 52 Barb. 125, that a married woman as surety cannot charge her separate estate in equity by a contract void at law. This would have been perhaps a practical protection to her property; but this case was overruled in the *Corn Exchange Insurance Co.* v. *Babcock*, 42 N. Y. 643, where it was held, that her endorsement of her husband's note without consideration bound her separate estate, if she added to the endorsement the words "she charged her individual property with the payment of the note." It is true, without these words the court said her separate estate would not be bound by her simple endorsement. But this is obviously no protection practically to her property, as every one after this decision would require her to insert these words before her signature.

In this case, *The Corn Exchange Insurance Co.* v. *Babcock*, 42 N. Y. 643, as well as in *Maxon* v. *Scott*, 55 N.

Y. 247, the court held, that this charge of a debt contracted by a married woman upon her separate estate is not a specific lien, but is enforceable against all such property, as she may have, at the time satisfaction is demanded; and it may therefore be a charge in general words specifying no particular property. In the last case they further deduced from this conclusion, that it might be verbal as well as general. In so deciding they destroyed all possible protection, which might have been supposed practically to have resulted from requiring married women to charge a debt on their separate estate, before it should be held liable.

The whole law as laid down by the New York courts now amounts to requiring a married woman woman to observe a certain form in contracting a debt, or giving security, that is, to say or write, as the case may be, that she will pay it out of her property; and even if she should not in a verbal contract observe this mere form, it would be practically easy to prove, that she did, For a fair witness could hardly be expected to remember, whether she said she would pay the debt out of her property, or simply said, she would pay it. For to the mind of any one, not acquainted with this exceedingly nice distinction, the one phrase, or the other, would be regarded as having identically the same meaning The exact words used could hardly be remembered; and yet on this unmeaning difference the rights of parties are to be determined.

The other portion of the rule laid down in *Yale* v. *Dederer*, 22 N. Y. 450; that if the married woman has not expressly or impliedly, charged her separate estate with the payment of a debt, it is only liable, when the consideration of this debt is for the *benefit of her separate estate*, in which case it will be an equitable mortgage, has, it seems to me, not been followed in a logical manner. It could, if not founded on a charge expressed or implied, be an equitable lien, only on the ground that as it was the duty of her trustee, or of her husband act-

80

ing as her trustee, if she had none, to improve the trust property. If the money of a stranger is thus expended, such stranger would be substituted to the right of the trustee, to charge the property itself with the reimbursement of the money, thus expended for the benefit of her estate; and on this ground this rule is based in the cases in South Carolina. See *Cater* v. *Eveleigh*, 4 Desau, (S. C.) 19; *James* v. *Mayrant*, *Id.*, 591; *Montgomery* v. *Eveleigh et al.*, 1 McCord (S. C.) Ch. 267; *Magwood & Patterson* v. *Johnston et al.*, 1 Hill's ch. 228. But if this be the basis of the rule, the separate estate of a married woman could only be liable, when the money borrowed was actually expended for the benefit of the separate estate, and this has been held in Pennsylvania. See *Hugh* v. *Jones*, 32 Pa. St. 432; but the contrary has been held in New York, in *McVey* v. *Cantrell*, 70 N. Y. 295. It was there decided, that if a married woman borrowed money, and gave her promissory note therefor, and stated at the time, that she wanted it for the benefit of her separate estate, it would be liable therefor, though not so expended, but used in family expenses. The court bases this decision on the presumption arising from her saying she wanted the money to improve her estate, proved by parol evidence, that she intended to charge her estate; and yet in *Yale* v. *Dederer*, the court actually refused to permit parol proof, that when she gave a note, she expressly stated, that her separate estate should be charged with its payment. Many other New York cases might be cited to show the utter impracticability of applying the rule laid down in *Yale* v. *Dederer*, 22 New York, so as practically to operate justly, and the inconsistencies and follies into which the effort to carry out this rule has led the New York courts.

The simple truth is, that if it is held, that a married woman's separate estate can be held liable only for debts, which she has charged upon it under her right to dispose of her property, the only reasonable conclusion is, that no debt can be charged on her separate estate, but where she has exercised her right of disposing of her property,

and has conveyed a specified portion of it to a trustee to be sold or rented, and the proceeds to be applied to the payment of a particular debt; or in other words, unless she has created a specified lien on a portion of her property to pay the debt. When the courts refused to adopt this necessary conclusion from the doctrine they laid down, they were entirely at sea. This was the only way, in which a *feme sole* could charge her property, especially her real property, with the payment of a debt. And refusing to apply common sense to determine how a married woman under her *jus disponendi* could charge a debt on her separate estate, they proceeded to invent modes of her so doing; and as in so doing they were guided by no reason, they came, as might be expected, to conclusions, in which no two courts could agree. In England, for instance, for a time they seemed to hold, that the simple giving of a bond, or note, amounted to this charge of her separate estate, because, if she meant the note to have any effect, it must have been meant to be a charge, as this is the only way in which it could have any effect. But though this reasoning was equally applicable to a verbal promise to pay, the English courts for a time refused to apply this rule to a verbal promise; it seeming too absurd to hold, that a mere contracting of a debt was the equivalent of disposing of property and making it liable to the payment of a debt.

The New York courts refused to adopt this rule, suggested by certain English judges, and in lieu thereof they adopted one which was equally unreasonable, whereby they held, if a married woman signed, or endorsed, a note and stated therein, that she intended to charge her separate estate, this intention should be held as the equivalent of a formal disposition of her property, a conveyance for instance of her real estate, in trust for the payment of a debt. But they did not stop here; they went further, and said, a mere verbal statement, that she would pay a debt out of her separate real estate, should be considered as the equivalent of a con-

veyance of it in trust to pay the debt. And they did not stop even here; they said, though she did not even say she intended to charge her separate estate, yet it would be so presumed under the circumstances of a particular case, and then they would hold her land responsible, as though she had conveyed it in trust for the payment of the debt. And finally they have gone so far as to say, that if when she borrowed money, she intended to expend it in improving her real estate, though this statement may have been utterly false, and though none of the money borrowed was so expended, still the court will regard this statement in the same manner, as if she had actually given a lien on all her property.

It is true they say, that the charge, they thus set up, is not a specific lien; but if the right to charge arises, as they say, solely from the right to dispose, how is it possible for the courts in reason to charge a debt on property not owned, at the time the charge is made? Yet this they constantly do. She could not possibly dispose of property, which she did not own, or which had no existence. How then can she charge it, if this charge is, as they say, deduced from her *jus disponendi*?

The whole doctrine is based on a false assumption, and leads to absurdities; and the English courts, which at one time showed some disposition to adopt it, have entirely abandoned it in substance, and hold now, that a married woman's separate estate is liable for her debts, not because of an imaginary charge under her *jus disponendi*, but because she holds property, as every one else does, subject to its incidents, one of which is liability to the payment of the debts of the owner. And though the New York courts hold, that they are so bound by their precedents, that they cannot follow the English example, yet Chief Justice Church admits the evil consequences, which have followed from their decisions, and calls, as it were, upon the legislature to cut the gordian knot, which the courts have tied.

Other New York decisions might be cited, to show the

impracticability and injustice of the rules, they have adopted, to determine whether the separate estate can be held liable for the payment of a debt contracted by her. But we will forbear; the cases we have cited in my judgment fully demonstrating the impracticability of these rules. Nevertheless rules or doctrines similar to those in New York, and based on the same idea, that the liability of a married woman's estate to her debts arises from her *jus disponendi*, and therefore it is responsible for no debt, which she has not expressly, or impliedly, charged on her separate estate, have been adopted in some other States, as in Kentucky, where it is held, that to render her separate estate liable, she must intend to charge it; but such intention may be proved by circumstances, and is implied, when she is living apart from her husband, and employed a lawyer to defend her son. See *Coleman* v. *Wooley's ex'r*, 10 B. Mon. 320.

They differ however from the New York cases, in holding that such intention is implied from her signing or endorsing a note, even though done by her as surety only, and she does not mention in the note, or endorsement, that she intends thereby to charge her separate estate; and proof, that she did not so intend, ought not to be received. See *Jarman* v. *Wilkerson*, 7 B. Munroe 293; *Bell & Terry &c.* v. *Kellar*, 13 B. Munroe 383. And it is further held in this state, that she may by a parol statement show her intention of charging a parol debt on her separate personal property, or it may be shown by circumstances, and it will thereby be charged: in this agreeing with the New York cases; but it is held by the Kentucky courts, that she cannot by a parol contract charge her separate real estate with the payment of any debt: differing in this respect from the decisions in New York. See *Burch et ux.* v. *Breckenridge, &c.*, 16 B. Munroe 482. The reason assigned is: (see page 487,) "that a wife cannot aliene or dispose of her real estate except by a written agreement; and as a charge upon it for the payment of debts operates upon it as a disposition *pro tanto*, it can only be created by a contract in writing."

1878
Special Term.

Radford et al.
v.
Carwile et al.

If this, as assumed by the New York cases, is the true ground, on which a wife's separate estate can be made liable, this reasoning would seem conclusive ; but it is not carried far enough, for it is certainly strange, that the mere signing of a bond not mentioning her real estate can be interpreted to be a deed of her husband in trust to pay a debt ; and that a mere statement made verbally, that she intends to pay a debt, she is contracting, out of her personal estate, can be construed to be a sale or disposition of any personal property to pay a debt. This distinction taken in Kentucky as to the mode, in which a wife's personal and real estate may be bound for the payment, is, so far as I know, followed no where else.

In Massachusetts in the case of *Willard* v. *Eastham et al.*, 15 Gray 328, Hoar, J., in delivering the opinion reviews the English decisions, and concludes, that the liability of a married woman's separate estate does not in England depend upon her charging it with the debt and its payments. He makes in this review substantially the conclusions as to the English law, which I have reached, and which were reached by Judge Comstock in *Yale* v. *Dederer*, 18 N. Y. 267 ; and it differs entirely from the conclusion reached by Judge Selden in the same case, 22 N. Y. 451. The case before the Massachusetts court was that of a note, in which the married woman was only surety, and which she did not charge on her separate estate. Judge Hoar, says, that " if the giving of a note or bond could be considered as an appointment, or charge, on her separate estate, and the source of the equity against her be found in such charge, or appointment, there would seem to be no well founded distinction between a contract by her as surety, and a contract by her as principal. But against this, the reasoning in *Murray* v. *Barlee*, 3 Myln. & K. 209 (9 Cond. En. Ch. R. 1)and *Owens* v. *Dickenson* 1 Cr. & Ph. 58, is quite conclusive."

The inference to be drawn from this is, that he entirely repudiated the idea, that a married woman's separate es-

tate was to be held liable, because only of any charge

made by her expressly or impliedly upon it; and that his general views coincided with the modern English decisions. And yet he says in another part of his opinion: " The results of the English decisions would therefore seem to be, that the separate estate of a married woman is answerable for all her debts and engagements to the full extent, to which it is subject to her own disposal." But he immediately adds : " The rule adopted in most of the courts of the United States has been materially different from that established in England; and the general current of American authorities supports the principle, that a married woman has no power in relation to her separate estate, but such as is expressly conferred on her in the creation of the estate; and her separate estate is not chargeable with her debts or obligations, unless where a provision for that purpose is contained in the instrument creating the separate estate. The authorities are very fully collected and commented on in the case of *Hulme* v. *Tenant*, in Hare & Wallace's edition of White's Leading Cases in Equity 324." In the last edition of this work, the fourth American from the fourth London edition, 1 Vol. 2 top page 747 side page 540, in the notes on *Hulme* v. *Tenant*, the editor comes to a conclusion the direct reverse to this. He says : "Agreeable to the main current of decision in the United States a *feme covert* may dispose of her separate property by any means not inconsistent with the terms of the grant.

Again Judge Hoar says : "We can see no sufficient reason for holding a contract, which is wholly void at law, from which neither the *married woman* nor her estate receives any benefit, and which does not in any manner refer to her separate property, nor undertake to make any charge upon it, to be a contract relating to such property." This language has reference to the Massachusetts statutes, Statutes of 1845 ch. 208, and 1855 ch. 304, which provide that a married woman "may conract sue and be sued, and have and be subject to the same

1879
Special Term.
_____
Radford et al.
v.
Carwile et al.

remedies in law or equity in relation to her separate property, and *any contract respecting it* made by her, as if she were unmarried." The conclusion of this opinion is: "And we think upon mature and full consideration, that the whole doctrine of the liability of her separate estate to discharge her general engagements rests upon grounds, which are artificial, and which depend upon implications, which are too subtle and refined. The true limitations upon the authority of a court of equity in relation to the subject are stated with great clearness and precision in the elaborate and well reasoned opinions of the Court of Appeals in New York in the case of *Yale* v. *Dederer*; and our conclusion is, that where by the contract the debt is made expressly a charge upon the separate estate, or *is expressly contracted* on its credit, or where the consideration goes to the benefit of such estate, or to enhance its value, then equity will decree it shall be paid from such estate, or its income, to the extent *to* which the power of disposal by the married woman may go. But where she is a mere security, or makes the contract for the accommodation of another, without consideration named by her, the contract being void at law, equity will not enforce it against her estate, unless an express instrument makes the debt a charge upon it."

It is very difficult from this opinion to ascertain the real opinion of the court. The opinions of the court in *Yale* v. *Dederer*, is referred to, as showing what the true law on the subject is, and those opinions are eulogized; but I am unable to tell, whether the case of *Yale* v. *Dederer*, as reported in 18 N. Y. 265, or the case of *Yale* v. *Dederer*, 22 N. Y. 450 is intended. Apparently they are both intended, as the opinions of the judges in this case are approved. Yet these two decisions, and the opinions of Judges Comstock and Selden, are, as we have seen, not only different but fundamentally opposed to each other. The syllabus in the first case is, that "equity recognizes a married woman's debt and charges it upon her separate estate, not on the ground that the contracting it is

of itself an appointment or charge, but because when con-
tracted on the credit of the separate estate, or for its bene-
fit, *or that of the woman*, it is just, that the estate should
answer it," but this view was entirely repudiated by
Judge Selden in his opinion in this case, when before the
court a second time, Sec 22 N. Y. 450. The syllabus too
in the second case is substantially a rejection of the doc-
trine in the first syllabus. It is: "In order to create a
charge upon the separate estate of a married woman,
the intention to do so must be declared in the very con-
tract, which is the foundation of the charge, or the con-
sideration must be obtained for the direct benefit of the
estate itself." According to the decision of the first case,
whenever a married woman contracts a debt *for herself
and not as surety*, her estate will be held liable, because
it is just, without any reference to whether it is charged
in the contract or not. According to the decision of this
case, when before the court a second time, the liability
of the separate estate does not arise, when a debt is con-
tracted by a married woman, because it is just it should
pay; but in such a case it will not be made liable, unless
she has charged it in her contract on her separate estate;
the only exception to this rule being when the debt is
contracted for the *direct benefit of the estate*. And by the
direct benefit of the estate is meant something very dif-
ferent from "for her own benefit," as Judge Selden's
opinion shows. The last decision is the one, which the
New York courts have attempted to follow. Which of
these the Massachusetts court approved, it is impossible
to say. The conclusion as expressed does not correspond
with either.

In agreement with the first decision of this case, Judge
Hoar says: "When the debt is expressly contracted upon
the credit of the separate estate," it will be charged by
a court of equity upon it. But this conclusion is repu-
diated by the second decision, except where the married
woman by contract makes it a charge. But in this con-
clusion of Judge Hoar he omits to say, as the first de-

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

cision in *Yale* v. *Dederer* declared, that if the debt is contracted for the *benefit of the woman,* it will be enforced against her separate estate, whether charged, or not, by her. Perhaps he considered this as included in what he had said about its being contracted on the credit of the estate. If so, his conclusion would be in accord with this first decision in *Yale* v. *Dederer*. If not, it is really not in accord with either decision. All we can say, after reading this case carefully, is, that in Massachusetts a married woman's separate estate is not liable on a note signed by her as surety, unless she has expressly charged her estate with its payment. But on what ground this decision is based, I am unable to determine, and therefore cannot tell, what is the law in Massachusetts, when the debt has been contracted by a married woman for her own benefit, but not for the direct benefit of her separate estate, and has not been by contract charged on her separate estate. Nor can I tell, whether her estate is there responsible for a debt contracted verbally, even if charged on her separate estate. Nor does any other case I have seen in Massachusetts remove these doubts.

In *Rogers* v. *Ward,* 8 Allen 387, it was held, that a married woman's separate estate was liable for a bond given for the price of land conveyed to her for her sole and separate use. But this was because it was for the direct benefit of her separate estate ; and it throws no light on this question, whether she would have been held liable, if it had been given for *her own benefit,* as for money borrowed to make a trip upon, and not for the direct benefit of her estate. Nor does the opinion delivered by the court in that case throw any light on the general question. I cannot therefore say, whether the New York course of decisions would, or would not, be followed in Massachusetts. I incline to the opinion, that they may be to some extent; but how far I cannot tell. Their law seems to be unsettled.

In New Jersey in the case of *Leacraft* v. *Hedden,* 3 Green. 552, it was held, that a bond, executed by a married

woman's trustee by her direction for a debt she owed, would be in equity regarded as an appropriation of so much of her separate estate as was necessary to pay it, (see page 552.) The bond did not expressly charge her separate estate ; and the case seems to have been decided, on the ground that the mere giving of the bond was a charge of it on her separate estate. Whether the mere contracting of a debt, not evidenced by writing, would be so regarded, does not appear from the reasoning of the court in the case. The liability seems to be based on the ground of an implied charge under her general power of disposition. But afterwards in the case of *Johnson* v. *Cummins,* 1 C. E. Green, 16 N. J. Eq. 104, this ground, of the separate estate being liable for debts only because of a charge, seems to have been abandoned, the court holding: " As a general principle, that a married woman is enabled in equity to contract debts in regard to her separate estate; and the estate will be subjected in equity to the payment of such debts. In order to bind the separate estate it must appear, that the engagement was made in reference to, and upon the faith and credits of, the separate estate. But if she be living apart from her husband and contracts any debt, the court will impute to her the intention of dealing with her separate estate, unless the contrary is shown."

I understand the rule to be, as thus stated, that if a wife contract a debt on her own credit, her separate estate will be charged with its payment. It is, I suppose, only necessary to show, that the debt was not contracted on the credit of her husband. If this be the correct inference from this decision, it is an entire abandonment of the idea, that a debt can be made out of a separate estate, only when there is an express or implied charge made on the separate estate by the married woman. That this is the correct view of this decision is, I think, shown by the case of *Armstrong* v, *Ross,* 5 C. E. Green, 20 N. J. Eq. 109. But whatever doubt may have been entertained from these decisions, they are settled by the re-

cent case of *Perkins* v. *Elliott*, 8 C. E. Green 23 N. J. Eq. 526, where it is settled, that a married woman's separate estate is liable for the payment of all her debts, whether charged on her estate, or not, if they were contracted for her own benefit; but it is not responsible for any security debt, though it be expressly charged by her on her separate estate. The notion, that any effect is to be given to her charging any debt on her estate by so stating in the contract, is thus distinctly repudiated. And the liability of her separate estate is based on its being her own debt, contracted for her benefit simply. There are no decisions referred to, to sustain the position, that her separate estate is not, and cannot be made, liable for any security debt, and so far as I am informed, this view is peculiar to the New Jersey courts. Though in Massachusetts they require it to be stated on the face of the note, when she signs it as security, that she thereby charges her separate estate, when perhaps they would not require this, if the note was given for a consideration enuring to her own benefit.

In North Carolina in *Frazier* v. *Brownslow*, 3 Ired. Eq. 237, it was held, that a married woman's separate estate was liable for any debts, she may contract with an understanding expressed, or implied, that they are to be paid out of such property. The reasoning of the court went to this full extent; but the case before them was of an express charge made by her on her property. But in *Knox* v. *Jordan et ux.*, 5 Jones Eq. 175, it was held, that a married woman's separate estate was not liable for her personal engagements generally, but only when the debt is charged specifically on her separate estate with the concurrence of her trustee; and so also in *Felton* v. *Reid*, 7 Jones 269. But it was held in *Leigh* v. *Smith*, 3 Ired. Eq. 442, that if she has power to will such estate, and does so, after her death it will be liable for all her debts in the hands of the legatee or devisee. See also to the same effect *Rogers* v. *Hinton*, Philip's Equity 101.

In Maryland it is held, that before the separate estate of a married woman can be charged with a debt, it must be shown to have been contracted with direct reference to such separate estate ; and therefore a note given by her for a debt not referring to her separate estate cannot be charged upon it. So far the Maryland decisions coincide with those of New York, but no further; for they hold, that parol evidence may be admitted to show, that when the note was given, she intended to pledge her separate estate. See *Gray* v. *Cooke*, 12 Gill & J. 236 ; *Conn* v. *Conn*, 1 Md. Ch. 218, and *Koontz* v. *Nabb*, 16 Md. 549.

It is clearly settled both in Alabama and Missouri, that a *feme covert* may contract in the same manner as a *feme sole;* and that her contracts, whether verbal or written, express or implied, are all binding on her separate estate without regard to her intentions, as they do not bind her separate estate as appointments. See *Ovley* v. *Ihelheimer*, 26 Ala. 332 ; *Caldwell* v. *Sawyer*, 30 Ala. 285 ; *Walker* v. *Smith*, 28 Ala. 569 ; *Collins* v. *Rudolph*, 19 Ala. 616 ; *Gunn* v. *Samuel's adm'r*, 30 Ala. 201 ; *Cowles et ux.* v. *Morgan*, 34 Ala. 535 ; *Coats et al.* v. *Robinson & Hendley*, 10 Mo. 469 ; *Whitesides* v. *Cannon*, 23 Mo. 457 ; *Claflin* v. *Van Wagoner*, 32 Mo. 252; *Schapoth* v. *Ambs et al.*, 46 Mo. 114; *Miller et al.* v. *Brown et al.*, 47 Mo. 504.

In Connecticut it has been decided, that a married woman has the full power of disposing of her separate estate, as though she were a *feme sole*, excepting so far as there is an express or implied restriction on her power in the instrument creating her estate. See *Imlay* v. *Huntington*, 20 Conn. 173. It may be inferred from the decisions in that state, that it would be held, that her separate estate was liable for the payment of her debts generally, though I do not find, that this question has been directly decided. See opinions of Judge Ellsworth in *Leavitt* v. *Beirne*, 21 Conn. 1, and *Taylor* v. *Shelton*, 30 Conn. 127.

In Wisconsin it is held, that if a married woman

contracts a debt on the faith and credit of her separate estate, it is liable therefor, though no charge be made by her either expressly or impliedly; and the decision in *Yale* v. *Dederer*, 22 N. Y., is expressly repudiated. *Todd* v. *Lee*, 15 Wis. 365; *Same Case*, 16 Wis. 506.

In California a married woman's estate is held liable for her debts not evidenced by writing, when she has either expressly or impliedly charged them on her separate estate ; and if the debt has been contracted for herself, or for the joint benefit of herself and her husband, or even for his benefit, this alone would generally be regarded as sufficient *prima facie* evidence of her intent to charge her separate estate , and it would be held liable. *Miller* v. *Newton*, 23 Cal. 569. This amounts practically to the English rule, that her separate estate is liable for all her debts. And the same may be inferred to be the law of Minnesota from *Pond* v. *Carpenter et al.*, 12 Minn. 432.

In Georgia it is held, that a promissory note given by a married woman, in which no reference is made to her separate estate, is binding on her separate property. See *Dallas* v. *Heard et al.*, 32 Ga. 604. This decision is based on the English authorities only, the American authorities being regarded as too conflicting to furnish any safe rule. I think we may fairly infer from the reasoning in the case, that whenever a debt is contracted by a married woman having a separate estate, it would be held liable there, whether the debt was evidenced by writing or not, unless it appeared, that it was not contracted on the credit of her separate estate.

In Vermont in the case of *Patridge et al.* v. *Stocker*, 36 Vt. 117, a married woman's separate estate was made liable for a simple contract debt not evidenced by writing. There was no charge made by her of this debt; but the court say, she clearly indicated an intention to charge her separate property with the payment of the debt, as though they regarded this as necessary; but nothing was proven to show this intent, except her contracting

the debt and conducting a business on her own account.

In *West* v. *West's ex'r*, 3 Rand. 373, it was decided, that a married woman having a separate estate as an incident thereto had a right to dispose of such separate estate at her pleasure, and as to her separate personal property, as included in this *jus disponendi*, a right to bequeath it by will ; but that she cannot devise her real estate, unless a power to do so is expressly conferred by the instrument creating the separate estate. This decision was based on the old English authorities, which clearly gave a right to a wife under her *jus disponendi*, as incident to her separate estate, to bequeath her personal property. The old English cases were however conflicting on her right to devise her real estate. Judge Cabell thought: "the decisions had gone far enough in allowing the wife by will to dispose of her separate personal property, as it cannot be said to be at all necessary to the enjoyment of the property ; at least not more necessary to the enjoyment of personal than of real property." He further said, he "could perceive no reason for giving her power to devise her separate real estate, which would not equally apply to any other real estate held by her," Judge Green says, as supporting this last view : "all land is her separate property ; and her devise of it cannot prejudice her husband, as he could only be in any case entitled to curtesy, and the devise must be subject to his right of curtesy." The consent of the husband, he thought, ought to make no difference ; "for if he could in any way give a legal effect to her devise, there would be the strongest temptation to control the will of his wife."

The recent English decisions have settled, as we have seen, that a married woman having a separate estate may under her *jus disponendi* incident to her ownership devise her real estate by will. But we will presently show, that the old English cases and the case of *West* v. *West*, are based on sounder reasoning. This case is a distinct repudiation of the basis, on which the decisions in South

Carolina and other States, which have followed her example, are founded. They deny, that a married woman can exercise any power over her separate estate, not expressly conferred on her by the instrument creating the separate estate. According to their view there is no *jus disponendi* incident to her ownership of a separate estate. Whereas the Virginia case holds, that this *jus disponendi*, so far as her personal estate is concerned, is as full and perfect as that of a *feme sole*; and her power over the rents and profits of her real estate is according to the Virginia case equally comprehensive. All the Virginia and West Virginia cases admit this *jus disponendi* as an incident to the ownership of a separate estate; and if they are followed, we must repudiate entirely the South Carolina decisions and also the decisions of Tennessee, Pennsylvania, Mississippi and Rhode Island, which have followed this South Carolina view of the law.

There is no question, but that the English decisions did admit this *jus disponendi* as incident to the ownership of a separate estate by a wife. And the South Carolina cases in denying it avowedly inaugurated principles of law in direct opposition to the law, as admitted to have been always held in England, from the time separate estates in married women were first recognized by courts of equity. If therefore the Virginia and West Virginia cases did not fully settle this point, I do not hesitate to say, that I must have held the long established and recognized law of England, as always laid down by its courts, as binding authority on us, which we would have to follow, whatever may have been our views as to its policy. If the law thus settled for a hundred years is to be changed, it must be by the Legislature and not by the courts.

The law as thus settled was distinctly recognized in the case of *Vizonneau* v. *Pegram*, 2 Leigh 185, where Judge Cabell delivering the opinion of the court says: "It is established in England by a long course of uniform decisions, that a married woman is, as to property

settled to her separate use, a *feme sole;* and as a consequence
of this principle, and as incident to the right of enjoyment,
that she has a right to dispose of her separate personal
property, and the *profits* of her separate real estate, in
the same manner, as if she were a *feme sole,* unless her
power of alienation be restrained or restricted by the
instrument creating the separate estate. The same prin-
ciple has been sanctioned by this Court in the case of
*West* v. *West's ex'or.*"

In the case of *Williamson* v. *Beckham,* 8 Leigh 20,
Judge Tucker says: " This case turns upon the question
whether a married woman can convey her separate
estate by other instuments, or in any other manner, than
that prescribed by the marriage settlement." Judge
Tucker then proceeds to examine this question, and he
thinks: "the English decisions are too unsettled and
contradictory to guide us upon the subject." He im-
pliedly admits, that the weight of English authority is
opposed to the conclusions he reaches; but he says: " the
decisions of the English judges are not binding on us;
and when those opinions are opposed to their own rea-
son and judgment, we should look upon them rather as
beacons to warn us from danger, than as land-marks to
guide us in our path. It is admitted even by the Eng-
lish cases, that if the deed or will, by which the separate
estate is created, expressly negatives any other mode of
disposition, than that which itself prescribes, the general
power of disposition is taken away. *Ewing* v. *Smith,* 3
Desau. 447. Now it is very singular, that the courts
should in any case have rejected the well established
principle or maxim of law, *expressio unius exclusio est
alterius.* When the contracting parties expressly pro-
vide the manner in which the disposition shall be made,
what else can be inferred, than that the *feme covert* is to
be confined to the mode prescribed?" The conclusion
he reached was: "that a *feme covert* holding a separate
property in real estate by deed or will, which empowers
her to dispose of it in a designated mode, cannot make a
82

disposition in any other, though other modes be not expressly negatived by the deed or will."

He refers in his opinion to no authorities except *Ewing* v. *Smith*, 3 Desau. 447, and Chancellor Kent's opinion in the *Methodist Church* v. *Jaques*, 3 Johns. Ch. 77, and English cases. He admits, that the weight of English authorities are opposed to this conclusion ; and it seems to me, that the decision of the court in the case of *Ewing* v. *Smith*, 3 Desau. 447, and the opinion of Chancellor Kent on this point, ought to have had very little weight with Judge Tucker ; for in *Ewing* v. *Smith* the court held, that a married woman as to her separate estate is not a *feme sole*, and has no right to dispose of her separate property, unless she is especially authorized so to do by the instrument creating her separate estate, and then only in the precise mode so prescribed. And Chancellor Kent strongly inclined to the same opinion. From his stand-point, the conclusion, to which Judge Tucker arrived, was almost a necessary conclusion. But the courts of Virginia in *West* v. *West*, 3 Rand. 373, and *Vizonneau* v. *Pegram*, 2 Leigh 183, had expressly repudiated the decision in *Ewing* v. *Smith*, 3 Desau. 447 ; and it would have been much more in point, had Judge Tucker sustained his views by reference to some authorities, which took the same general view of the subject as the Virginia courts. While the entire court concurred in the decision of *Williamson* v. *Beckham*, there are good reasons for believing, that Judge Tucker's opinion expressed the views of no other member of the court except himself. The syllabus of the case gives his conclusion, not as that of the court, but as that of Judge Tucker. The court which decided the case consisted of Judges Tucker, Brooke, Cabell and Brockenbrough. We have no means of knowing the views of Judge Brooke; but Judges Cabell and Brockenbrough, in a case decided a year thereafter, inform us, that they do not concur in these views; and that in the particular case of *Williamson* v. *Beckham* they considered, that the deed creating the separate

estate "as clearly showed that it intended to exclude all other modes of alienation, as if it had used express terms of exclusion; and therefore *quoad* that case *expressio unius exclusio alterius.*" See Judge Cabell's opinion in *Lee et al.* v. *The Bank of the United States,* 9 Leigh 213. In this opinion Judge Brockenbrough concurred.

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

If these views be correct, all that was decided in *Williamson* v. *Beckham* was, that a married woman could not dispose of her separate estate in a manner, which the instrument creating the separate estate prohibited either *expressly* or by *clear implication.* And the decision itself in the case of *Lee et al.* v. *The Bank of the United States,* according to the construction put by a majority of the court on the instrument creating the separate estate is in conflict with the views and conclusions drawn by Judge Tucker in *Williamson* v. *Beckham,* 8 Leigh 20. Judge Cabell in the last case says: "that he is decidedly of opinion, that the weight of authority is against the argument of Judge Tucker." See 9 Leigh 208.

The reasoning and conclusion as to the law contained in Judge Tucker's opinion were, it seems to me, disapproved by the court in *Woodson, trustee,* v. *Perkins,* 5 Gratt. 345. In that case "a deed of a marriage settlement settled the wife's property upon her for her exclusive use and benefit, and to be at her sole and only disposal; and then provides, that the trustee shall convey and deliver the property, or any part of it, to such persons, in such proportion, and at such times, as the wife shall from time to time, notwithstanding her coverture, *by any writing under her hand and seal, attested by three or more credible witnesses, or by her last will and testament, executed in writing in like manner, before the like number of witnesses, direct.*" It was decided : 1. That the wife is invested with the full power of disposing of or charging her personal estate, to all intents and purposes, as if she were a *feme sole.* 2. That the clause in reference to the mode of her direction to the trustees to convey, though it may enlarge her power, so as to enable her, by her

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

sole act, to dispose of portions of the property embraced in the deed, which otherwise she would not have aliened by deed without her husband's joining with her, does not operate to restrain or limit the general power of disposition, which she retains over her personal estate by the terms of the deed."

This seems to me to be a repudiation of the maxim of *expressio unius exclusio est alterius*, as applicable to the construction of an instrument creating a separate estate, in reference to the powers of the wife to dispose of the same. Still this case does not seem to have been regarded as finally settling the law on this point in Virginia ; for in *Nixon* v. *Rose, trustee*, 12 Gratt. 431, Judge Moncure says : " In Virginia the right to restrain or interdict the power of alienation has been expressly recognized and affirmed in several cases : *West* v. *West's ex'r*, 3 Rand. 373 ; *Vizonneau* v. *Pegram*, 2 Leigh 183 ; *Williamson* v. *Beckham*, 8 Leigh 20 ; *Lee* v. *The Bank of the United States*, 9 Leigh 200. The only question seems to have been whether the specification of one mode in the settlement is an implied exclusion of the right to pursue any other ; and that question seems not yet to 'be finally settled. Judge Tucker maintained the affirmative side of the question in the two cases last cited ; and the decision of the first of the two cases, so far at least as he was concerned, was founded on that view. Judge Cabell on the other hand was decidedly of the opinion, that even in regard to personal property, the weight of authority is the other way, and that so far as the disposition of real estate was concerned, Judge Tucker's views were clearly unreasonable. He distinguished the case of *Lee* v. *The Bank of the United States* from the case of *Williamson* v. *Beckham*, on the ground that in the latter an intention to exclude all other modes of alienation, than that prescribed in the settlement, was apparent upon its face. Judge Brockenbrough concurred in Judge Cabell's opinion, which prevailed, the court being composed of three judges. See *Woodson, trustee*, v. *Perkins*, 5 Gratt. 345."

The question involved in this controversy has a de-

1879
Special Term.
Radford et al.
v.
Carwile et al.

cided bearing upon the point under discussion in the case, before us for decision and on the question of the liability of the wife's separate estate to the payment of her debts. An examination of the authorities will show clearly, that their great weight is opposed to the views expressed by Judge Tucker in *Beckham* v. *Williamson*, 8 Leigh 20. The decisions in South Carolina, Pennsylvania, Tennessee, Mississippi and Rhode Island are of course entitled to no weight in considering this question, as these decisions are fundamentally different from those, which are the basis of the Virginia decisions and the decisions in other States as well as England. The weight of authority is decidedly in favor of the position, that where property is settled to the separate use of a married woman, she is to be regarded as a *feme sole* as to that property, and she may dispose of it, in any manner she pleases, unless specifically restrained by the instrument, under which she takes the property; and although a particular mode of disposition is pointed out in the settlement, it will not preclude her from adopting another mode of disposition, unless there are negative words restricting her power of disposition except in the mode pointed out. See *Jaques* v. *The Methodist Episcopal Church*, 17 Johns. 548; *Fireman Insurance Company* v. *Bay*, 4 Barb. 414; *Gardner* v. *Gardner*, 7 Paige 112; 22 Wend. 526; *Vanderheyden* v. *Malony*, 1 Coms. 462; *Strong* v. *Skinner*, 4 Barb. 546, 553; *Guild* v. *Peck*, 11 Paige's Ch. 475; *Whiteall* v. *Clark*, 2 Edw. Ch. 149; *Kimm* v. *Whippart et al.*, 46 Mo. 542; *Whitaker* v. *Blair*, 3 J. J. Marshall 239; *Imlay* v. *Huntington*, 20 Conn. 147; *Harris* v. *Harris*, 7 Wend. 115; *Parkes* v. *White*, 11 Ves. 222; *Pybus* v. *Smith*, 1 Ves. Jr. 189; *Wiltz* v. *Dawkins*, 12 Ves. 501; *Brown* v. *Like*, 14 Ves. 302; *Sturgis* v. *Corp*, 13 Ves. 190; *Acton* v. *White*, 1 Sim. & St. 429; *Talbot* v. *Armstrong*, 4 Beav. 319; *Standford* v. *Marshall*, 2 Atk. 68; *Grigby* v. *Cox*, 1 Ves. Sr. 517; *Cartoney* v. *Neiman*, 3 Bro. 346; *Clarke* v. *Pistor*, 3 Bro. 546; *Ellis* v. *Atkinson*

3 Bro. C. C. 565; *Sperling* v. *Rockfort*, 8 Ves. 164.

It is true a contrary view has been taken in a number of cases. See *Cooke* v. *Husbands et al.*, 11 Md. 492; *Leaycraft* v. *Hedden*, 3 Green. (4 N. J. Eq. R.) 552; *Weeks* v. *Sego*, 9 Ga. 199; *Swift* v. *Castle*, 23 Ill. 209; *Caverly* v. *Dudley & Bisco*, 3 Atk. 541; *Hyde* v. *Price*, 3 Ves. 437; *Milnes* v. *Busk*, 2 Ves. Jr. 488; *Whistler* v. *Newman*, 4 Ves. 129; *Mores* v. *Huish*, 5 Ves. 692. But the weight of the English authorities are opposed to Judge Tucker's views, as he admits; and the general spirit of those American cases, which are opposed to his views on this point, is more in accordance with the general spirit of the Virginia and West Virginia decisions than the decisions in those States, which sustain his opinion on this point. Since the decision in *Woodson, trustee*, v. *Perkins*, 5 Gratt. 345, I can hardly think, that the Virginia courts can sustain the views expressed by Judge Tucker in *Williamson* v. *Beckham*, 8 Leigh 20.

If a married woman has a general *jus disponendi* as an incident to her ownership of separate property, it would seem both on reason and authority, that this power ought not to be taken from her by inference, drawn from the deed creating her separate estate, specifying a particular mode of disposing of her property, but only by either an express negative of any other mode, or by its appearing clearly from the deed that the grantor intended to exclude her from disposing of the property in any other mode. And such inference ought not to be drawn from the simple fact, that he has expressly authorized her to dispose of the property in a specified manner.

In *Penn* v. *Whitehead*, 17 Gratt. 503, it was decided: "that if the power to dispose or charge the wife's separate estate is not denied expressly or by implication, she has the power as incident to her separate estate;" and in that case it was held that her separate estate was liable for debts contracted by her in carrying on a trade with her husband's consent. In *Muller* v. *Bailey*, 21 Gratt. 528, a deed of trust, executed by a married woman to secure her husband's debt, pursuant to an authority conferred on

her to pledge her separate estate, was sustained. And in *Burnett et ux.* v. *Hawk's ex'r*, 25 Gratt. 486, it was decided, that a wife's separate estate is liable for the payment of a debt evidenced by a bond signed by her as surety of her husband, in which she did not charge her separate estate with its payment. This case is in direct conflict with *Yale* v. *Dederer*, 22 N. Y.

It is true that Judge Staple does in delivering the opinion of the court say, "it is not sufficient that the wife has separate estate ; it must also appear that it was her intention to charge it with the debt in question. In some cases it is held, that when the debt is not for the benefit of the wife herself but for another person—when she executes the obligation merely as surety—it is essential that the writing shall contain some reference to the separate estate, indicating the purpose to create the charge. In other cases it has been decided, that if the wife execute a bond or note as principal or as surety, she must be presumed to have intended a charge on her separate estate ; and this is the prevailing opinion, supported by a great weight of authority. So that it must be taken as the settled rule, that if a wife contract a debt as principal, or as surety, for her or for her husband, or jointly with him, the instrument executed by her is sufficient to charge her separate estate, without any proof of a positive intention to do so, or even a reference to such an estate contained in the writing."

I apprehend the true reason, why no proof of her intention in such case to charge her separate estate and no reference to it in the writing is required, is that no such intention is necessary ; it is chargeable simply because it is her debt and her property ; and it would be therefore equally liable, whether the debt was evidenced by writing, or was merely a parol debt. Her intent is perfectly immaterial, as would be the intent of a *feme sole* in contracting a debt. If it were at all essential, it would be as clearly implied from her contracting a debt by parol as by executing a note ; for it is obvious, that the note

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

is given simply as evidence of the contracting of the debt.

Following this Virginia decision it has been held in West Virginia, see *Patton's trustees et al.* v. *Merchant's Bank of Charleston et al.* 12 W. Va., 587, "that a married woman is regarded by a court of equity as the owner of her separate estate; and the *jus disponendi* is an incident to such estate; that it is an incident thereto, unless and except so far as it is denied, or restrained, by the instrument creating the estate; but it is subject to such limitations and restrictions, as may be contained in such instrument, which may give it *sub modo* only, or withhold it altogether. And in regard to separate personal estate, and the rents and profits of separate real estate, the power of disposition, if unrestrained, may be exercised in the same way, by deed, will or otherwise, as if the woman was a *feme sole*. But in regard to the *corpus* of real estate it can be disposed of only in such mode, if any, as may be prescribed by the instrument creating the estate, or unless prohibited by such instrument, in the mode prescribed by law; and as incident to the *jus disponendi* a *feme covert* may charge her separate estate with the payment of her debts. She may charge it as principal or as surety, for her own benefit, or that of another. She may appropriate it to the payment of her husband's debts. She may even give it to him, if she pleases, no improper influence being used or exerted over her."

In *Darnall et ux.* v. *Smith's adm'rs et al.*, 26 Gratt. 878, it was decided, that "if a married woman having a separate estate enters into a pecuniary engagement, whether by ordering goods or otherwise, which, if she were a *feme sole*, would constitute her a debtor; and in entering into such engagement, she purports to contract not for her husband but for herself, and on the credit of her separate estate, and it was so intended by her, and was so understood by the person with whom she is contracting; that constitutes an obligation, for which the

person, with whom she contracts, has the right to make her separate estate liable; and the question, whether the obligation was contracted in this manner, must depend upon the facts and circumstances of each particular case." This language is the exact language of Sir R. T. Kindersley, V. C., in *Mrs. Mathewman's case*, Law R. 3 Eq. 787; 7 Eq. Cases 19; and, as I understand it as used by him, he intended to hold, that whenever a married woman enters into an engagement, which if she were a *feme sole*, would constitute her a debtor, that by her entering into this engagement her separate estate was liable for the debt she thereby contracted, though nothing was said about her owning a separate estate; or in other words, that her separate estate was liable for all her debts. His going on afterwards and specifying that, in order that her estate should be liable, she must purport in ordering goods not to contract for her husband, but for herself, and on the credit of her separate estate, and that it must be so intended by her, and so understood by the person with whom she was contracting, as I understand, merely intended to indicate the view of the judges, that ordinarily in ordering goods it should be inferred, that the wife was acting as agent of the husband, it being his duty to supply his family with necessary goods, and therefore in such a case a debt so contracted by her must be clearly shown to have been contracted for herself, and on her credit, not that of the husband, and that the merchant so understood the transaction. In such a case, as is put, this distinct evidence is essential to show, that it was her debt; but that being shown I understand the judge to hold, that her separate estate is liable.

In many cases where there could be no doubt, but that she was creating a debt of her own, and not acting as agent of her husband, I apprehend no evidence would be necessary to show, that she was dealing on the credit of her estate; and in any case it is only necessary to show this, to establish that it is her debt, and not her husband's. Such evidence is useful only for this purpose,

and not to show, that she intended to charge her separate estate. This charge of her separate estate follows as a conclusion of law from her contracting the debt; and it is entirely independent of any intention on her part to make such a charge on her separate estate.

I must therefore dissent from the conclusion drawn from *Mrs. Mathewman's case* in *Darnall et ux.* v. *Smith's adm'r et al.*, 26 Gratt. 878 : "The liability of the separate estate of a married woman can only arise out of the supposed intention, of the wife, and no pecuniary engagement can be a charged upon the wife's estate, which is not connected by agreement, either express or implied, with said estate." Nor do I think this portion of the syllabus in that case is consistent with another portion of the syllabus, which is : "A married woman, possessed of a separate éstate, may charge the same with her debts in like manner and to the same extent as a *feme sole*." For we all know a *feme sole* by simply contracting a debt charges (in the sense in which this word is used in this case) all her property with the payment of the debt; and this charge exists, though the debt be not connected in any manner with her property by agreement either expressed or implied. In fact her declaring, that she charged her property, has no effect whatever, when a debt is contracted by a *feme sole* ; and it ought not, if this portion of the syllabus is sound, to have any effect, in the case of a married woman. If the *feme sole* when she contracted the debt, had declared ever so emphatically, that her property should not be held bound to pay it, the law would nevertheless hold it bound ; and if the married woman contracted a debt for herself, her declaration tion, that her separate estate should not be held bound, would be equally unavailing, though such declaration would be very persuasive evidence, that she was contracting the debt not for herself but for her husband.

The word "charge" in this case is used in a very vague and indefinite sense. It is said a married woman

may charge her separate estate in like manner and to the same extent as a *feme sole ,*" but in the proper sense of the word "charge" a *feme sole* can charge her property only by executing an instrument, which creates a specific lien, such as a deed of trust, or mortgage; but such is obviously not the meaning intended by the word "charge" as here used. If used in the sense of rendering her estate generally liable for a debt, then, when it is said "a married woman may charge her separate estate in the same manner and to the same extent. as a *feme sole,*" it must mean, that as a *feme sole* in contracting a debt thus charges all her property, no matter what was her intention, so a married woman in contracting a debt charges all her separate property, no matter what was her intention. So understood, I conceive that this portion of the syllabus in that case expresses the law correctly, and is sustained by the English authorities and the weight of American authorities.

There are some Virginia cases on the power of a *feme covert* to sell and convey her separate real estate in fee, and also the liability of the *corpus* of her real estate for the payment of her debts ; but they will be more appropriately noticed, when we consider the extent of the liability of the separate estate of a married woman for the payment of her debts, and the mode of enforcing such liability. But before considering this we will consider the effect upon the provision of law, which has been produced by the passage of chapter 66 of Code of W. Va., 1868, in reference to the separate property and rights of married women. The only provisions of this chapter, which have any bearing on the subject, are the first, second and third sections. See Code of W. Va. ch. 66 §§1, 2, 3. They are:

"1. All real and personal property heretofore conveyed directly to a married woman, or to a trustee for her use, by any person other than her husband, as her sole and separate property, and the rents, issues and profits thereof shall be and remain her sole and separate property,

as if she were a single woman; and the same shall in no wise be subject to the control of her husband, or be liable for his debts.

"2. The real and personal property of any female, who may hereafter marry, and which she shall own at the time of marriage, and the rents, issues and profits thereof shall not be subject to the disposal of her husband, nor liable for his debts, and shall be and continue her sole and separate property, as if she were a single woman.

"3. Any married woman may take by inheritance, or by gift, grant, devise, or bequest, and hold to her sole and separate use, and convey and devise, real and personal property, and the rents, issues and profits thereof, in the same manner, and with like effect, as if she were unmarried, and the same shall not be subject to the disposal of her husband, nor be liable for his debts. Provided, that no married woman, unless she is living separate and apart from her husband, shall sell and convey her real estate, unless the husband join in the deed, or other writing, by which the same is sold or conveyed."

The second and the third sections were taken from an act of the Legislature of New York, passed April 7, 1848, for the more effectual protection of the property of married women, ch. 200 §§1 and 3, as amended by a statute, passed in 1849, ch. 375, §1. See Revised Statutes of New York vol. 3 pp. 159, 160, ch. 8, art. 6 §§75 and 77.

To the New York law however we in our Code added the proviso at the end of the third section, which proviso is not in the New York law. So far as we have adopted the New York statutes we must be regarded ordinarily, as having adopted the construction, which had been placed upon them by their courts; and accordingly this court following the New York decisions has held, that a married woman could under the third section of our statute acquire and hold for her separate use a *legal* estate in lands or personal property instead

of a mere equitable estate in the use of such property, which alone could have been held by her prior to the passage of this act; but that this section did not remove the legal incapacity, which prevented a married woman from contracting debts, and that therefore her promissory note or other engagement was still void at law, yet her legal estate created by this statute could be charged with her debts and liabilities, in a proper case, by a court of equity, just as her separate equitable estate could have been charged prior to the passage of this act. *Stockton* v. *Farley*, 10 W. Va. 171

We are now to determine, when and in what manner her debts can be charged on her separate property by a court of equity.

The New York courts hold, that "in equity there is no difference between the separate estate of a wife, created by the operation of the statutes of 1848 and 1849, relating to married women, and a similar estate, created by deed or any other instrument." See *Yale* v. *Dederer*, 18 N. Y. 279. The real estate, sought to be subjected in this case to the payment of a debt of Martha A. Carwile, a married woman living with her husband when the debt was contracted, was conveyed to her by third parties, not her husband, on May 26, 1874, or after the passage of our Code. The deed conveying the property was a deed in the usual form, not declaring it was for her sole and separate use. In fact it does not from the face of the deed appear even, that she was a married woman. If this deed had conveyed lands in New York, under section 77 of chapter 8, article 6 of the revised statutes (see N. Y. Revised Statutes, vol. 3 p. 160), of which our law is a copy, excepting only the proviso we have added, under the New York decisions it would have the same effect in a court of equity, as if the deed had been made prior to the passage of that act, and there had been inserted in it the provisions of that section: that is, as if the deed had provided, that the property conveyed should be held to her sole and

separate use, with the right to convey this real estate, or any interest or estate therein, and the rents, issues and profits thereof, in the same manner and with the like effect, as if she was unmarried; and that the same should not be subject to the disposition of her husband or be liable for his debts.

An important proviso has however been added by our Legislature to the third section, declaring that, "no married woman, unless she is living separate and apart from her husband, shall sell and convey her real estate, unless her husband joins in the deed or other writing, by which the same is sold or conveyed." Which must, as the land is in West Virginia, be regarded as incorporated in the deed to Mrs. Carwile. It is obvious, that in New York under their statutes the liability of a *feme covert's* land to her debts would, if she took the lands as separate estate, by virtue of the statute be the same, as if she took the land under a deed simply creating a separate estate in the land with full power to dispose thereof. The effect of this proviso we can better comprehend, after we have considered the extent of the liability of the separate real estate of a married woman held under a deed, which simply created such separate estate without placing on her any restrictions. The liability of her separate estate can only be enforced in a court of equity, whatever that liability be. *Stockton* v. *Farley*, 10 W. Va. 171. There is no controversy, that if her separate estate is liable to the payment of any debt, it may be enforced by the sale of her separate personal property and by the application to its payment of the rents and profits of her separate real estate. See *Hulme* v. *Tenant*, 1 Bro. C. C. 16. But the question, whether a court of equity can go further and sell her separate real estate, is by no means settled clearly.

In considering this question I shall confine myself to the case, where her separate estate is derived from some person other than her husband either before their marriage, or afterwards, and where the instrument, which con-

veys the separate estate, confers on her no power except what arises from ownership of the separate real estate as an incident to such ownership, and where on the other hand it imposes on her no restraint. The question, whether the *corpus* of her separate real estate held in this manner can be sold by a court of equity to pay her debt contracted during marriage, depends upon the question, to what extent her common law disability to contract any debt is in the view of a court of equity removed by her ownership of separate real estate as an incident to such ownership. An enquiry into the extent of her power of disposing of such real estate as an incident to such ownership will throw much light upon this question.

What is her power to dispose of such real estate during coverture by will?

Neither by the common law, nor by the Statute of Wills of Henry VIII, could a married woman in any instance devise her real estate either with or without the consent of her husband. And so much opposed was the common law to allowing a married woman to devise her real estate, that even before the Statute of Wills of Henry VIII it was held, that a custom for a *feme covert* to devise lands was void, because of the presumption of law that the devise would be made by the constraint of her husband. See *Forse and Humbling's Case.* 4 Co. 61. It is true, that a power to dispose of real estate by will might be conferred on a married woman; but then the devisee took the real estate not under the will of the *feme covert*, but under the original instrument, which conferred the power on the *feme covert*. Over her separate personal estate and over the rents and profits of her real estate she has, as we have seen, the unquestionable power to dispose of them by will during coverture, as an incident to her ownership of such separate estate.

Does she possess the same power over her real estate?

At the end of the case of *Peacock* v. *Monk*, 2 Ves. Sr. 190, it is said by Willis, Chief Justice, upon consultation

*1879*
*Special Term.*

*Radford et al.*
*v.*
*Carwile et al.*

with the other justices, that when land was settled to the separate use of a *feme covert*, generally, without any power to devise it, her will of such land was void. And in the same case it was held, that though in a settlement she had the express power to devise land, yet if with the produce of this land she purchases other real estate, though such real estate would be for her separate use, yet she could not devise this land so acquired. These cases are based upon the principle, that a wife owning separate real estate has not, as incident to such ownership, a right to dispose of it by will, though she may so dispose of her separate personal property, and the rents and profits of her real estate, simply as an incident to their ownership. See *Gore* v. *Knight*, 2 Vern. 535 ; *Rich* v. *Cockell* 9 Ves. 369 ; *Fettiplace* v. *Gorges*, 3 Bro. C.C. 8. This seems to have been acquiesced in as the law, so far as I can learn, in all the old English cases.

The only question of controversy in them was, whether this rule, that a wife could not dispose by will of her separate estate, could not be modified by an agreement with her husband prior to her marriage. In *Peacock* v. *Monk*, 2 Ves. Sr. 190 ; *Hearl* v. *Greenback*, 1 Ves. Sr. 101, and *Hodsden* v. *Loyd*, 1 Madd. Ch. 375, Lord Hardwick and Lord Thurlow considered, that when the legal estate remained in her, though there was an agreement between her and her husband, that she might devise her lands, yet such a devise would be void as against the heir. And in *George on Demise of Thornburg* v. *Jew*, 2 Amb. 627, it was held, that an ante-nuptial agreement with a husband could not authorize a wife to devise land ; but the contrary was held in *Rippon* v. *Dawding*, 2 Amb. 565, and *Power* v. *Bailey*, 1 Ball & B. 49. The ground of these decisions seems to be, that the husband having before marriage agreed, that the wife might devise her lands, she could compel in equity the husband by fine to settle the lands on her intended devisee, as the agreement before marriage was binding on both parties. But an agreement of this kind after marriage not being bind-

ing, a devise by a wife of her lands after such agreement would be void. See *Dillon* v. *Grace,* 2 Sch. & Lef. 463.

But whatever be the merits of these controversies, they do not effect the question we are considering. For when they held the devise of a married woman valid, it was so decided, expressly on the ground that her intended husband had agreed before marriage, that she should have such power; and without it, all the cases agree, she would have no such power. It would seem therefore, that the old English cases settled the law to be (in the language of Roper on Husband and Wife, vol. II p. 182,) "with respect to the rents and profits of real estate, a gift of them to a wife for her separate use enables her to dispose of them as a *feme sole,* in the same manner she may do of personal estate so limited to her; but in the following respect there is a difference between the two estates; for a limitation of real estate to a wife in fee to her sole and separate use, without expressing more, will not enable her to dispose of it during marriage otherwise than by fine or recovery."

If this be correct law, in such a case in this State she could not devise such land, nor could she convey it in any manner except by uniting with her husband, and being privily examined, the mode which by our statute is substituted for fine and recovery.

Clancey, in his work on Married Women, after reviewing the authorities says: "It is to be attended to in these cases, where it was held that a married woman, to whose separate use real estate had been settled, could bar the heir and prevent the estate from descending upon him, it was not so decided, upon the ground that a *feme covert,* having separate estate, was competent to act in respect to it, as if she were *sole*; but upon the ground of an agreement between the husband and wife, that she should have such power; so that the rule, that a *feme covert,* acting with respect to her separate property, is competent to act in all respects, as if she were *sole,* must be understood

only of personal property and of the rents and profits of real estate during her life. If an estate of inheritance be limited to her for her separate use, without a power of appointment, it seems she cannot bar her heir by any act except fine," or if this be law in this State, by any act except a deed, in which her husband unites, and which she acknowledges after privy examination: the mode, by which she alone can convey lands, substituted by us for fine.

This was held to be the English law in more recent cases according to White & Tudor's notes, wherein it is stated : "It is however held by many judges, that a *feme covert* could not by will dispose of real estate settled to her separate use, without an express power of appointment, or by act *inter vivos*, otherwise than by fine and recovery, or since the Fines and Recoveries Act, by deed duly executed in conformity with its provisions, so as to disinherit or bind her heirs. *Churchill* v. *Dibben*, 2 Keny. Pt. II 68, 84; *Anon.* cited *Peacock* v. *Monk*, 2 Ves. 380; *Newcomen* v. *Hussard*, 4 Ir. Ch. 268, 273, 274; *Harris* v. *Mott*, 14 Beav. 169 ; *Lechmore* v. *Brotheridge*, 32 Beav. 353." See White & Tudor's Leading Cases in Equity, 4th American from 4th London edition, notes to *Hulme* v. *Tenant*, vol. 1, side page 490, top page 686.

I have no access to any of these reports except 2 Vesey ; but I doubt not they establish the position they are cited to sustain ; for Peachy, a recent English author, in his work on marriage settlements, quoted from by Bishop on the Law of Married Women, vol. 1, §851, says : "But notwithstanding a wife may dispose of her personal estate, settled to her separate use, as she thinks fit, whether by act to take effect in her lifetime, or by will, it was formerly held, that she could not, during the coverture, without an express power of appointment reserved to her, part with the fee simple in any freehold estate of inheritance settled to her separate use, so as to bind her heir, otherwise than by concurring with her husband in

levying a fine or suffering a recovery. And the present prevailing impression appears to be, that in default of an express power of appointment, she can now only dispose of the inheritance by a conveyance executed in conformity with the provisions of the statute for the abolition of fines and recoveries. If she omit to make such disposition, the land will descend to her heir. And to sustain this he cites *Peacock* v. *Monk*, 2 Ves. Sr., 190 ; *Churchill* v. *Dibben*, 2 Keny, Pt. II 68, 84 ; *Doe* v. *Scott*, 4 Bing. 503, *Sand's Cases*, 5th ed. 384 ; Clancy on Married Women ; 2 Roper on Hus. & W. 2d ed. 182; *Newcomen* v. *Hassard*, 4 Irish Ch. 274 ; *Moore* v. *Morris*, 4 Drew.· 38 ; 3 Jur. (N. S.) 553.

But within the last twenty years, and since Peachy wrote, several decisions have been rendered in England, from which Bishop in his work says, §852: "it appears, that the distinction between real and personal estate, as respects the wife's power over what is settled to her separate use, appears to be done away with." Referring however to these recent cases, the notes to White & Tudor's Leading Cases, vol. II, side page 490, top page 686, speak more strongly. They say : "the result however of the recent authorities establishes, as a general proposition, that a married woman having real property settled to her separate use in fee, and not restrained from alienation, has as incident to her separate estate, and without any express power, a complete right of alienation by instrument *inter vivos* (not acknowledged under the Fines and Recoveries Act) or by will."

These recent English cases are: *Taylor* v. *Meads*, 34 L. J. (N. S.) ch. 203 ; *Hull* v. *Waterhouse*, 5 Giff. 64 ; 13 W. R. (V. C. S.) 660; 11 Jur. (N. S.) 361 ; *Pride* v. *Bubb*, 7 L. R. ch. App. 64 ; *Appleton* v. *Rowley*, Law Rep. 8 Eq. 139, 149 ; *Adams* v. *Gamble*, 12 Ir. Ch. R. 102 ; *Atchison* v. *LeMann*, 33 L. T. 302. I have no access to these cases, but presume, that the ground, on which they proceed, is fairly stated by Lord Chancellor Westbury, in *Taylor* v. *Meads*, as quoted in the notes to White &

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

1879.
Special Term.

Radford *et al.*
v.
Carwile *et al.*

Tudor's Leading Cases, vol. I, side pages 490, 491, 492, top pages 686, 687, 688. He says : "It would be contrary to the whole principle of the doctrine of separate use, to require the consent, or concurrence, of the husband in the act, or instrument, by which the wife's separate estate is dealt with or disposed of. That would be to make her subject to his control and interference. The whole matter lies between a married woman and her trustees ; and the true theory of alienation is, that any instrument, be it deed or writing, when signed by her, operates as a direction to the trustees to convey, or hold, the estate according to the new trust, which is created by such direction. This is sufficient to convey the *feme covert's* equitable interest. When the trust thus created is clothed by the trustees with the legal estate, the alienation is complete both at law and in equity." He concludes : "I must hold therefore, that a *feme covert*, not restrained from alienation, has, as incident to her separate estate, and without any express power, a complete right of alienation by instrument *inter vivos* or will."

In the United States it has been generally held, that a married woman has no power to dispose of her separate real estate except by joining with her husband in a sale or deed, and acknowledging it before an officer, or court, after her privy examination. See *Wright* v. *Brown et ux.* 44 Penn. St. 224; *Camden* v. *Vail et al.*, 23 Cal. 633; *Haugh et al.* v. *Blythe's ex'r*, 20 Ind. 24 ; *Dodge* v. *Hollinshead*, 6 Minn. 37 ; *Miller* v. *Hine*, 13 Ohio St. 565 ; *Miller* v. *Wetherby*, 12 Iowa 415; Richardson L. R. vol. 13 p. 178; *Hinckley* v. *Smith*, 51 N. Y. 21; *Clayton* v. *Frazier*, 33 Tex. 91. But the decisions in the United States generally have been so much influenced by the legislation in the several States, that an examination of them with a view of ascertaining what was the power of a married woman to dispose of her separate real property by deed, or by will, independent of statute law, would be entirely unsatisfactory, and is also unnecessary, as the law on this subject is well settled by Virginia decisions, which are binding authority on this court.

1879
Special Term.

Radford et al.
v.
Carwile et al.

In the case of *West* v. *West's ex'r*, 3 Rand. 373, as far back as 1825 it was decided, that as an incident to the ownership of separate property, a married woman has a right to bequeath her separate personal property and the rents and profits of her real estate; but she has no right to devise her separate real estate. The rule being: that as to personalty the *jus disponendi* is incident to a separate estate; but as to real property, a married woman cannot devise it, unless a power to do so is reserved by the instrument creating the estate. Ever since this decision this has been regarded as settled law. The case has been since frequently referred to with approval; and no judge has ever intimated, that it was not properly decided.

The principles, on which this case was decided, evidently lead us to the conclusion, that a married woman cannot dispose of her real estate by deed, or contract of sale, as an incident to her ownership of such separate estate; but she can only convey it in the same manner, as she can convey her real estate, in which she has no separate property, that is by uniting in a deed with her husband, and after her privy examination acknowledging the deed before an officer or court; and accordingly it has been so expressly decided in *McChesney et al.* v. *Brown's heirs*, 25 Gratt. 393, and *Hawley* v. *Troyman, trustee, &c.*, 29 Gratt. 728.

In *McChesney* v. *Brown*, 25 Gratt. 404, the court further held, that while the rents and profits of her real estate were personal property, which she could dispose of in any manner, yet if she invested them in real property, she could not dispose of it except in the manner, in which she is authorized by law to convey her real estate, in which she has no separate estate. In reaching this conclusion the court acted upon the principle laid down in *West* v. *West's ex'rs*, 3 Rand. 373, which they refer to as sustaining this position.

The court thus lays down the law on this subject in that case: "In regard to the separate personal estate and

rents and profits of separate real estate, the power of disposition, if unrestrained, may be exercised in the same way by deed, will or otherwise, as if the owner were a *feme sole*; but in regard to the *corpus* of separate real estate, it can be disposed of only in such mode, if any, as may be prescribed by the instrument creating the estate; or unless prohibited by such instrument in the mode prescribed by law for the alienation of real estate of married women." This expresses accurately, what, I conceive, has been our well settled law for more than fifty years. But to estimate properly what influence this law should have upon the question, whether a court of equity can order the sale of a married woman's real estate to pay her debts, we must ascertain the reason, which induced our courts following the old English decisions to make this marked distinction between the power of a wife to dispose of her personal property and the rents and profits of her real property, and her power to dispose of her real estate.

It has been suggested, that the reason of this distinction was, that the power to dispose of her separate personal property and the rents and profits of her separate real estate was absolutely essential to her enjoyment of her separate property as property: it would in a very great degree be valueless, unless she had the right to dispose of it; and therefore this power of disposition was held to be an incident to her ownership of the property; but that the power to dispose of her real estate was not necessary to its enjoyment as property; and therefore this power was not incident to the ownership of her real property. This may, and doubtless did, have its influence in establishing this distinction; but it is obvious, that it was not the only, or even the principal, reason for adopting this distinction; for it has always been held both in England and by us, that a wife upon her death can bequeath her personal property. Now this power of disposing of her personalty, which she still owns at the time of her death, is no more essential to the enjoyment of it

as property, than the power of disposing of her land by will is ; and yet one is allowed by us and the other denied.

To understand the controlling reason for this distinction we must consider, why courts of equity recognized at all her right to hold a separate estate. During her coverture by the common law she was under an absolute disability to make any contract; and her husband had a right to all her personal property and the rents and profits of her real property during the coverture. These were under his absolute control as owner, and liable to his debts. But over the *corpus* of her real estate he had no control whatever; it did not belong to him, and was not liable for his debts. The whole object of a court of equity in recognizing a separate estate in a married woman was to deprive the husband of these marital rights, and to recognize in the wife an ownership of that part of her property, of which by the common law her husband had the control and ownership ; that is, to recognize in the wife an ownership during her coverture of her personal property and the rents and profits of her real estate. The common law fully recognized her ownership of the *corpus* of her real estate, and fully protected it against the control of her husband, or from liability for his debts. There was no necessity for a court of equity to make any changes in the common law with reference to the *corpus* of her real estate; and they accordingly made no change. As at common law she could not dispose of the *corpus* of her real estate by her sole deed, nor could she devise it, because of her utter disability to make any contract, or to make a will, the court of equity left these rules of the common law in full force, as they in no manner touch, or affect, the subject matter, which they had taken under their charge, that is her personal property and the rents and profits of her real estate, which would have belonged to her husband but for the interposition of the courts of equity.

That this is the true view of the equitable doctrine of a separate estate seems to me to be shown by the undispu-

ted law, that so soon as the marital rights of the husband cease by his death, the courts of equity ceased to regard the estate of the married woman as a separate estate, or liable to any of the rules of a court of equity in reference to such estates. Immediately on the death of the husband the wife may accordingly dispose of her separate property, though the deed creating the separate estate contains an express restraint on such alienation. As long as the husband's marital rights continue, these restraints are binding on the wife. But, as the court recognized it as a separate estate simply to avoid the husband's marital rights, as soon as it is impossible for him, by reason of his death, longer to exercise any marital rights, the court at once ceases to recognize any longer the equitable separate estate ; and therefore she can dispose of it as she pleases in violation of the restraints on alienation inserted in the deed creating the estate. See *Tullett* v. *Armstrong,* 1 Beav. 1, 4 Myl. & Cr. 390; *Scarborough* v. *Borman,* 1 Beav. 34, 4 Myl. & Cr. 377 ; *Clarke* v. *Wyndham,* 12 Ala. 789 ; *Miller* v. *Bingham,* 1 Ired. Eq. 423 ; *Smith* v. *Starr,* 3 Whart. 62.

Though there is not the same unanimity on this point, yet many courts go further and hold, that upon the death of the husband the separate estate of the wife ceases; but on the marriage of the widow to a second husband it revives, and the rules of a court of equity governing a separate estate will be again applied during the continuance of the second marriage. See *Beaufort* v. *Collier,* 6. Humph. 487 ; *Roberts* v. *West,* 15 Ga. 123 ; *Shirley* v. *Shirley,* 9 Paige 364 ; *Waters* v. *Tazewell,* 9 Md. 291 ; *Nix* v. *Bradley,* 6 Rich. Eq. 43 ; *Tullett* v. *Armstrong,* 1 Beav. 1, 4 Myl. & Cr. 377 ; *Scarborough* v. *Borman,* 4 Myl. & Cr. 378.

These decisions are clearly based on the idea, that the separate equitable estate is recognized merely to protect against the husband's marital rights ; and if so, it ought not in any manner to affect the *corpus* of the wife's real estate, which never was subject to the husband's marital

rights. These views seem to me very obvious; and though they have been recognized as correct, when attention has been called to them, yet they have often been lost sight of by the courts, and much difficulty and confusion has thereby been produced. It seems to me, so far as I have the means of judging, they have been lost sight of in the recent English cases holding, that a married woman may devise or sell the *corpus* of her real estate. The reasoning is based on the tacit assumption, that a court of equity in reference to the *corpus* of her real estate must protect it, as a part of her separate estate, from the control of her husband. Whereas the common law effectually protected it against such control, and this new equitable doctrine, now introduced in England, so far from protecting it, effectually removes the careful guards, which the common law had thrown around it for its protection.

The views I have above expressed, though frequently lost sight of, have never been denied, and have been frequently expressly recognized. These views are stated so clearly by Judge Comstock in his able opinion in *Yale* v. *Dederer*, 18 N. Y. 270, that I will quote them. He says: "but the separate estate, upon which courts of equity engrafted these peculiar doctrines, included *necessarily* only such rights and interests of the wife, as would belong to the husband but for the limitation of her particular use. Such were personal estate, the rents and profits of land during coverture and the inchoate title, which by the birth of a child the husband might acquire, as tenant by the curtesy. As to all such interest, the assent of a husband to a separate use duly manifested, or a direction to that effect by the donor of the estate, would give to the wife all the disposing capacity of a *feme sole*. But her own reversion in lands, when she owned them at the time of the marriage, was a legal estate descendible to her heirs, to which the courts of equity did not, and could not, well apply the doctrines which heve been stated. In reference to such estate she only had the disposing capacity, which

the common law, or some enabling statute, allowed her. She could devest her title, and bar the descent to heirs, in England only by a fine or recovery, and in this country only by a conveyance with certain solemnities of examination and acknowledgment. *Her acquisition through a trust of equitable rights, which at law would belong to her husband, manifestly could not enlarge her capacity to deal with estates, which at law as well as in equity were entirely her own.*" And he afterwards adds: "these general principles, which scarcely admit of question, are evidently fatal to the present attempt to *charge the fee of Mrs. Dederer's lands* and to dispose of *the fee* for the satisfaction of her alleged debt. "

The application of this law to the question before us in this case is obvious. If these views be correct, it must follow, that a court of equity can in no case sell the lands of a married woman to pay her debt, except where she has made it liable by a mortgage or deed of trust, executed by her and her husband, and duly acknowledged by her after privy examination, or when it is subject to a specific lien. All that a court of equity can do, in any other case, is to sell her separate personal property, and apply the rents and profits of her real estate during the coverture to the payment of her debt.

If we were to base the liability of her separate estate on the ground, that she has the power of disposing thereof in the view of a court of equity, and therefore the power to charge it; and that such charge will be regarded as a species of disposition, and the contracting of the debt as evidence of the intent to so charge it, it is obvious, that nothing can be liable for the payment of a debt, except what she has the power in the view of a court of equity to dispose of, that is, her separate personal property and the rents and profits of her separate real estate during the continuance of the coverture. Or if we base the liability of her separate estate to the payment of her debt on its true ground: that it is in equity an incident to the recognition by a court of equity of her owner-

1879
Special Term.

Radford et al.
v.
Carwile et al.

ship of a separate equitable property, it can of course extend no further than the recognition of this separate equitable ownership of property, that is, to her separate personal property and the rents and profits of her real estate during the coverture.

It is not pretended, that her real estate, in which she has no separate estate, can be subjected to the payment of any debt, she may contract during coverture, simply because she has a separate estate in personalty or other lands. And as the *corpus* of her separate real estate is in exactly the same situation as the *corpus* of her other lands, in which she has no separate estate, it must fellow, that it is no more liable to the payment of a debt contracted during coverture, than is any other of her lands. The common law disability of a married woman to contract a debt effectually protects all her lands and other property from liability to pay such debt, excepting only that which a court of equity regards as under her absolute control, that is, her separate personal property and the rents and profits of her land during coverture. The English courts have accordingly, in enforcing the debts of married women out of their separate property, always declined to order the sale of their real property. They have ordered the sale of the separate personal property, and ordered the application to the payment of the debt of the rents and profits of the separate real property, but have declined to go any farther.

The leading case of this subject is *Hulme* v. *Tenant*, 1 Bro. C. C. 16, decided by Lord Thurlow. In rendering his decision he says: "determined cases seem to have gone thus far: that the general engagements of a wife shall operate on her personal property, shall apply to the rents and profits of her real estate, and that her trustees shall be obliged to apply the personal estate, and rents and profits, when they arise, to the satisfaction of such general engagements; but the court has not used any direct process against the separate estate of the wife, and the manner of coming at the separate property of the

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

wife has been by decree to bind the trustees, as to personal estate in their hands, or rents and profits, according to 'the exigencies of justice, or the engagements of the wife to be carried into execution. I know of no case, which has gone further than that. Suppose the wife to have power by settlement, to dispose of her real estate to any uses she thinks fit, yet the trustees must make the formal instrument, without which the estate can not pass. I know of no case, where the general engagements of the wife have been carried to the extent of decreeing, that the trustees of her real estate shall make conveyances of that real estate, and by *sale*, mortgage or otherwise raise the money to satisfy that general engage - ment on the part of the wife."

The same view of the law is taken by the Master of the Rolls in *Aylett* v. *Ashton*, 1 Myl. & Cr. 105, 111. He says : "although a *feme covert* has power, and the court has jurisdiction, over the rents and profits of her separate estate, no case has given effect to her contracts against the *corpus* of her separate estate."

Whether the new departure taken by their recent decisions, to the effect that a wife may dispose of the *corpus* of her real estate without the concurrence of her husband, will lead to a departure from their long established rule, I can not know. These recent decisions seem to me to be inconsistent with this rule; but it may be, that instead of abandoning their long established rule, they will abandon these recent decisions, and return to the principles on which their courts till recently acted.

In *Yale* v. *Dederer*, 21 Barb. 293, the court ordered the sale of the separate real estate to pay a debt. The case was moved to the Appellate Court, (see 22 N. Y.,) but nothing is said in the Court of Appeals about what would have been the proper mode of enforcing the payment of the debt, had the separate estate of the married woman been liable therefor. Nor is any reason given by the court, in rendering its decision, that the land should be sold rather than rented to pay the debt. As

Judge Comstock, as we have seen, in his opinion above quoted in this very case stated, that it could not be sold, if Mrs. Dederer held it under a conveyance prior to the statutes of 1848 and 1849, that is upon the general principles governing courts of equity, independent of statute law, I presume this order of sale was based on the fact, that after the case was sent back, it was made to appear, that Mrs. Dederer held her separate estate under the statutes of 1848 and 1849; and those statutes (the same as ours except our proviso is added) conferred on her unlimited power to control and dispose of the *corpus* of her real estate at her pleasure; and therefore it was held liable to the payment of her debts, for which her separate estate was responsible; and as in New York lands were liable to sale under execution, the court decreed Mrs. Dederer's lands to be sold to pay this debt. But it was done, only because the New York statute, changing the law as it had stood, authorized a married woman to dispose of her real estate at her pleasure without the concurrence of her husband. Our statute does not confer such authority on her; and therefore the law in New York, where the debt is charged on the real estate because of her power to dispose of it, has no application here, where she has no such power, and where the liability of her separate estate in no case arises from her power of disposition, but is an incident to her absolute ownership and control over it in equity.

In the case of *Miller* v. *Newton*, 23 Cal. 554, it is true, the majority of the court held, that a wife's separate estate was liable to a debt, though their statute declared that "the husband shall have the management and control of the separate property of the wife, during the continuance of the marriage"; but no sale or other alienation of any part of such property can be made, nor any lien or incumbrance created thereon, unless by an instrument in writing signed by the husband and wife, and acknowledged by her upon examination separate and apart from her husband." It will be ob-

served, that this statute applied equally to separate per-
sonal and real property. The majority of the court was
of opinion it regulated only the mode, in which a spe-
cific lien could be created on any separate property, but
in no manner affected the liability of separate property
to the payment of a married woman's debts generally.
Judge Cop was of opinion that it abolished all liability
of a separate estate for the payment of a wife's debts, un-
less it had in the manner prescribed been made a specific
lien. But the majority of the court expressed no opinion
on the question, whether the *corpus* of the real estate
could be sold to pay her debts, though it was discussed
by counsel.

The provision in our statute can obviously have no
effect upon the liability of the separate estate, so far as
the personalty and the rents and profits of the real prop-
erty during the coverture are concerned; but this Cali-
fornia case throws no light on the question, whether the
insertion of this proviso does not leave the law, as it
was before the passage of the statute, so far as the liability
of the *corpus* of the real estate to the payment of her debts
is concerned.

In Indiana, where the statute provides that "no lands
of any married woman shall be liable for the debts of
her husband ; but such lands and the profits therefrom
shall be her separate property as fully, as if she were un-
married : *Provided*, that such wife shall have no power
to incumber or convey such lands except by deed in which
her husband joins, " the Supreme Court decided in *Cox's
adm'r. v. Wood et al.* 20 Ind. 54, that except where her real
estate was liable to a vendor's lien, the *corpus* of it could
not be sold to pay any of her debts not made in the manner
specified ; but the rents and profits of it could be applied
to the payment of her debts. It seems to me, that if this
Indiana statute is properly thus construed, our statute
must be given this construction also, as they do not differ
materially, so far as the question under discussion is con-
cerned.

In *Whitesides* v. *Cannon*, 23 Mo. 457, the court ordered the sale of a married woman's separate real estate to pay her debts. The question in controversy was, whether a married woman's separate estate was liable for a debt, she had not charged upon it. The court held, that it was. In the opinion rendered it is assumed, that a married woman has the power to dispose of her separate estate at her pleasure; and in this respect the court makes no allusion to any distinction between real and personal estate, a distinction which exists in this state and in Virginia. If this distinction is to be disregarded, then the question, whether the *corpus* of her real estate is to be sold, must depend principally, if not entirely, on the general policy of the law in reference to the sale of lands to pay debts, which differs in different States. This seems to be the only light, in which this question was regarded by the court. They say: "we think the remedy under our law is by sale, which ordinarily will be the most benificial remedy to all parties in interest."

In *Tiernan* v. *Poor et al*, 1 Gill and J., 216, the separate real estate of a married woman was ordered to be sold; but in that case the court held, that the married woman had executed, what the court held was a valid mortgage upon it; and its sale was therefore evidently proper.

In Virginia there is a recent case, in which it might at first appear, that the courts held the rents and profits of a married woman's separate real estate, accruing after the death of the husband, liable to the payment of her debts incurred during the marriage. I refer to the case of *Leake trustee v. Benson et al*, 26 Gratt. The wife owned as her separate property a farm in Culpepper, and also personal property, what amount does not appear, but it is presumed, that it was the stock upon the farm, if nothing more. She signed certain notes of her husband as security. After his death the farm in Culpepper was sold, and I presume, with it the stock and personal property, sufficient to pay all the unpaid notes, which she had signed with her husband. If so, the court, in renting out the

*1879*
*Special Term.*

*Radford et al.*
*v.*
*Carwile et al.*

Charlottsville property, really merely substituted these rents for the personalty she had invested in the Charlottsville house and lot; and these debts, contracted during the marriage, may have been thus really paid in effect out of the proceeds of her separate personal property.

With the proceeds of this sale she bought a house and lot near Charlottsville, where she and her children removed; and she there, after her husband's death, incurred other debts; and the court ordered this Charlottsville property to be rented out to pay these debts, including some, which she had incurred by signing notes as security for her husband, which remained unpaid. The case is so imperfectly reported, that we cannot say, whether this was so, or not. The point in controversy was, whether she was a tenant in common with her children, or had a life estate in the property; whether, if she had a life estate, it was separate property; and whether any of her separate estate was liable for her debts. These were all the points considered by the court; and if they did in point of fact apply the rents and profits of her real estate, accruing after her husband's death, to the payment of any of her debts, contracted during her coverture, they did so without any discussion of the point, and without any apparent consideration of it. The case is therefore I think entitled to very little, if any, weight on this point.

It seems to me therefore, that upon principle the *corpus* of the separate real estate of a married woman, where the instrument creating it simply creates such an estate, is not liable to the payment of any debt of a married woman created during coverture, except such as are specific liens upon it; and that to the payment of her general debts nothing can be applied, except her separate personal estate and the rents and profits of her real estate, which accrue during the coverture; and that the same law is applicable to the separate estate, personal and real, which a married woman acquires under our Code. While the authorities are conflicting, their weight seems to me to sustain also this doctrine.

While our Code expressly forbids a married woman, without the concurrence and joint action of her husband, to create any specific lien on her real estate, or to sell it, we would violate its spirit, if we held, that what she cannot do directly, she may do indirectly, and by incurring debts, without her husband's consent or approbation, she can not only incumber her real estate, but subject it to sale. The common law, by disabling her from making any contract during coverture, effectually protected the *corpus* of her real estate. The rents and profits of her real estate during the coverture and her personal estate belonged to the husband. These courts of equity, where a separate estate was created, effectually protected it against the husband's marital rights, and against his debts. But there was no occasion for courts of equity to furnish any protection so far as the *corpus* of her real estate was concerned. The common law protected it most effectually. In it the husband had no marital rights, and it was not liable to his debts; and the wife's disability effectually prevented it from being liable to any of her debts contracted during coverture; and with this disability, so far as her contracts would affect the *corpus* of her real estate, courts of equity never interfered.

No one pretends, that her contracts made, or debts incurred, during coverture, can affect her real estate, which is not held as separate property, even though she has other separate property. And the *corpus* of her separate real estate is no more liable for her debts, than is any other real estate she may own. It would be unreasonable, because our statute authorized her to will her real estate, to hold, that she thereby had such complete control over it, and such ownership of it, that as incident thereto it is liable to her debts, when the statute expressly declares she cannot sell, except by the concurrence and joint act of her husband. And if, as some of the courts have held, the separate estate is held liable for the payment of her debts, only because she is supposed to have intended to charge, or dispose of it for that purpose, when she contracted the debt,

86

1879
Special Term.

Radford *et al.*
v.
Carwile *et al.*

it is still more clear, that the *corpus* of her real estate cannot be held liable for her debts, as she has no power to dispose of it for that purpose, and of course cannot be supposed to have intended to do so, when she contracted the debt.

Our conclusions are:

Syllabus 1.

1. A married woman, as to property settled to her separate use, is to be regarded as a *feme sole,* and has a right to dispose of all her separate personal estate, and the rents and profits of her real estate accruing during coverture, as if she were a *feme sole*: unless her power of alienation is restrained by the instrument creating the estate.

Syllabus 2.

2. Such restraint upon her power of alienation will not be implied from her being authorized to dispose of the property in a particular manner. Such restraint must be either expressed, or so clearly indicated, as to be equivalent to an express restraint.

Syllabus 3.

3. The *jus disponendi* is an incident to the ownership of a separate estate, and can only be taken away, or limited, by express words, or by an intent so clear as to be the equivalent of express words.

Syllabus 4.

4. The liability of the separate estate to the payment of all debts, incurred by a married woman, is also an incident to ownership of the separate estate; and it can only be taken away, or limited by express words, or by an intent so clear as to be the equivalent of express words.

Syllabus 5.

5. But these incidents, liability to the payment of her debts, and her *jus disponendi,* extend no farther than to all her separate personal property, and the rents and profits of her separate real estate accruing during coverture.

Syllabus 6.

6. The *corpus* of her separate real estate is in no manner affected by the equitable doctrine of a separate estate, which was devised to prevent the acquisition by the hus-

band of his marital rights to all her personal property 1879 Special Term. and the rents and profits of her real property during Radford et al. v. Carwile et al. coverture.

7. The common law effectually protected the *corpus* of Syllabus 7. her real estate, and her common law disability to make any contract, or incur any debt, during the coverture, which will affect or charge the *corpus* of her real estate, is still in full force, whether such real estate be separate property, or not. It can only be affected, or charged by conveyance, or specific lien, in which her husband unites, and which she executes after privy examination, or by a vendor's lien, when it has been reserved, unless the instrument creating her separate estate expressly authorizes her to dispose of it or charge it otherwise.

8. The debts of a married woman, for which her sepa- Syllabus 8. rate estate is liable, arise from any transaction, out of which a debt would arise, if she were a *feme sole*, except that she is not liable for a bond or covenant, which she has signed and sealed, but which was given without any consideration; she not being estopped from denying the consideration in a court of equity.

9. The consideration, which will support her debt or Syllabus 9. contract so as to make her separate estate liable, need not enure to her own benefit, or that of her separate estate, but it may enure for the benefit of her husband, or of any third person, or simply be a prejudice to the other contracting party.

10. But such contract, to be binding on her separate Syllabus 10. estate, must be in writing, when it binds her to pay the debt of her husband, or any other person.

11. The above rules will apply to a separate estate of a Syllabus 11. married woman held under the 3d section of chapter 66 of the Code of West Virginia, except: 1. She holds the legal instead of the mere equitable title to such separate property. 2. She can devise such real estate. 3. If living separate and apart from her husband, she may sell and convey her real estate without her husband joining

1879
Special Term.

Radford et al.
v.
Carwile et al.

in the deed or contract of sale; and it is liable for all her debts contracted while she was so living apart from her husband. 4. Whether if living with her husband, she can sell her real estate, if her husband joins her in the written contract and conveyance, without her being privily examined, is questionable; and we express no opinion on this point, it not arising in the case. 5. Whether this section has any effect on the question, whether a husband has a right to curtesy, or as distributee, or administrator of his wife in reference to her separate estate, is doubtful; and we express no opinion on this point.

Syllabus 12.

12. A separate estate under this 3d section of chapter 66 of our Code, is created simply by a conveyance of land to her, though it is not conveyed for her sole and separate use.

There is no difficulty in applying this law to the facts in the present case. It is said by the appellee's counsel, that there is no proof that the bond had been transferred by Radford to his co-plaintiff, Light. Radford testifies, that Light paid him the value of the bond sued on; and he has no interest in it. The bond is filed with the bill, and this is certainly sufficient evidence to show, that it belongs to Light. It was urged, that the bond does not charge Mrs. Carwile's separate estate with its payment. It was entirely unnecessary that it should do so; her separate estate is liable for its payment without such charge, to the same extent that it would be, had such charge been specifically named in the bond. The evidence, as to whether it was given on the credit of her separate estate, it is said, is unsatisfactory. It is immaterial, whether or no it was given on the credit of her separate estate; it is sufficient, that it was given for a consideration.

It is further contended, that it was not given for the benefit of her separate estate; and authorities are cited to sustain this view; but this too is entirely immaterial. It is chargeable on her separate estate, simply because it is her debt; and it is her debt, because the liability

arose out of a contract based on a valuable considera-
tion : the conveyance of land. Had it been a voluntary
bond, it could not have been enforced against her sepa-
rate estate. For though if she had been a *feme sole*, she
would have been estopped from denying, that it was
given for a valuable consideration, yet her sealing it
would not estop her in equity from showing, that the
bond was voluntary, and she was not liable at law. In
the common law courts it would be a mere nullity.

In this case the consideration enured to her benefit.
But it would have been equally binding on her separate
estate, had she been the mere surety of her husband.
The *corpus* of this real estate is not however liable for
the payment of this bond. All, that the court can sub-
ject to the payment of the debt, is the rents and profits
of her real estate during the continuance of her cover-
ture, as she has no separate personal estate.

The decree of the circuit court of September 1, 1877,
dismissing the bill must be reversed ; and the appellants
must recover their costs expended in this court ; and
this cause must be remanded to the circuit court of
Fayette county, with instructions to have the real estate,
in the bill and amended bill named, rented out from
year to year for a sufficient time during the coverture of
Martha A. Carwile, and these rents applied, first to the
costs incurred by the appellants in this court, and then
to the costs in the circuit court, and then to the payment of
the debt in the bill and amended bill mentioned, and in-
terest due thereon, due to the plaintiff Henry Light ;
and to be further proceeded with according to the rules
governing courts of equity.

JUDGES HAYMOND AND JOHNSON CONCURRED. JUDGE
MOORE not sitting in the case.

JUDGMENT REVERSED and CAUSE REMANDED.